UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

EDWARD GARRY,

                           *Plaintiff*,

        - against -

THE CITY OF NEW YORK;
ROBERT T. JOHNSON,
as Bronx County District Attorney and
policymaker for THE CITY OF NEW
YORK, DETECTIVE GEORGE
MILLIAN, Individually and as an
employee of the New York City Police
Department,


                           *Defendants*.

_____

**COMPLAINT AND
JURY DEMAND**

        Plaintiff EDWARD GARRY, by his attorneys Glenn A. Garber, P.C., and Rickner PLLC,

hereby alleges as follows:

### NATURE OF ACTION

        1.        This is an action to recover money damages for the violation of GARRY'S rights

under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as

well as supplemental claims under the laws of the State of New York and the New York State

Constitution.

        2.        This action is related to the wrongful conviction of GARRY, who, despite his

innocence, served nearly 22 years in prison for the August 18, 1995 Bronx murder of retired

New York City Police Department ("NYPD") detective Oswald Potter.

        3.        This tragedy was caused by the intentional misconduct of Angelo MacDonald, the

1

Assistant District Attorney in the Bronx County District Attorney's Office ("BCDAO") handling Garry's prosecution, and Defendant GEORGE MILIAN, a NYPD detective who was in charge of the Potter murder investigation and responsible for the arrest of Garry and continued case against him.  It also due to the fault of Defendants CITY OF NEW YORK (and ROBERT T. JOHNSON, the District Attorney of the Bronx and a policymaker for the CITY OF NEW YORK), for fostering an unethical culture of convictions at all costs and at the expense of fair and honest investigations and prosecutions, and for the failure to train, supervise, and/or discipline prosecutors and police officers to dissuade them from engaging in unscrupulous and illegal acts that violate the rights of the accused.

## JURISDICTION AND VENUE

4.     This Court has original subject matter jurisdiction over GARRY'S federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because GARRY'S claims arise under laws of the United States, namely 42 U.S.C. §§ 1983 and 1988, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution, namely the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

5.     This Court has supplemental jurisdiction over GARRY'S state law claims pursuant to 28 U.S.C. § 1367(a) as they are part of the same case or controversy giving rise to the federal claims and share the name nucleus of operative facts as the federal claims.

6.     Venue is lodged in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(a)-(c) and 1402(b) because substantial parts of the events or omissions giving rise to the claim occurred in the Southern District of New York.

**CONDITION PRECEDENT TO SUPPLEMENTAL STATE CLAIMS**

7.    GARRY   complied with all conditions precedent to the commencement of the supplemental state claims.

8.    On or about April 27, 2018, GARRY timely served, a notice of claim upon the Defendant CITY OF NEW YORK pursuant to Section 50-i of the New York General Municipal Law.

9.    More than 30 days has elapsed since GARRY served the notice of claim and no payment or adjustment or offer of settlement has been made.

10.    GARRY submitted to a hearing pursuant to Section 50-h of the New York General Municipal Law on August 16, 2018.

11.    GARRY brings this action in a timely manner.

**JURY DEMAND**

12.    GARRY demands trial by jury in this action.

**PARTIES**

13.    GARRY was wrongfully indicted, prosecuted, tried, convicted, and imprisoned by the unlawful and illegal actions of the Defendants.

14.    Defendant CITY OF NEW YORK is and was at all times relevant herein a municipal corporation existing under and by virtue of the laws of the State of New York, and having the powers and duties imposed by law thereon, and is situated in the Southern District of New York.

15.    The NYPD and the BCDOA are and were at all times relevant herein agencies of the Defendant CITY OF NEW YORK.

16.     At all times relevant to this action, defendant CITY OF NEW YORK, by its agents, servants, and employees was responsible for the operation, maintenance, and control of NYPD, and the selection, training, supervision, evaluation, and disciplining of police officers and other NYPD employees.

17.     At all times relevant to this action, defendant CITY OF NEW YORK, by its agents, servants, and employees was responsible for the operation, maintenance, and control of the BCDAO, and the selection, training, supervision, evaluation, and disciplining of Assistant District Attorneys (also referred to as prosecutors) and other BCDAO employees.

18.     At all times relevant to this action, defendant ROBERT T. JOHNSON was the Bronx County District Attorney ("DA"), a policymaker for the BCDAO, and was responsible for the operation, maintenance, and control of the Office, and the selection, training, supervision, evaluation, and disciplining of Assistant District Attorneys  and other BCDAO employees.

19.     Defendant Detective GEORGE MILIAN is and was at all relevant times herein, a duly appointed agent, employee, officer, and servant of the NYPD. Defendant MILAIN is being sued in his individual capacity and in his official capacity as a police officer of the NYPD.

20.     Non-Party Assistant District Attorney ("ADA") Angelo MacDonald is and was at all relevant times herein, a duly appointed agent, employee, officer, and servant of the BCDAO.

21.     At all relevant times herein, Defendant MILIAN acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and on behalf of and within the scope of his employment, duties and functions as an agent, employee, officer, and servant of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of his lawful functions and duties.

22.    At all relevant times herein, ADA MacDonald  acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and on behalf of and within the scope of his employment, duties and functions as an agent, employee, officers, and servant of the BCDAO, and otherwise performed and engaged in conduct incidental to the performance of his lawful functions and duties.

23.    Defendants MILIAN and DA JOHNSON are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS

### Procedural History

24.    On November 19, 1997, GARRY was wrongfully convicted after a jury trial of murder in the second degree and two counts of robbery in the second degree.  All charges are felonies under the laws of the State of New York.

25.    The judgment of conviction was rendered after a jury trial under indictment number 6083-1995 in the Supreme Court of the State of New York, Bronx County, before Justice William Donnino.

26.    On December 17, 1997, GARRY was sentenced to twenty-five years to life in prison.

27.    On February 3, 2000, the Appellate Division, First Department, affirmed the conviction and upheld the sentence.  *People v. Garry,* 269 A.D.2d 158 (1st Dept. 2000).   Leave to appeal in the Court of Appeals was denied on April 14, 2000.  *People v. Garry,* 94 N.Y.2d 947 (2000).  And, a petition for a writ of habeas corpus was denied on June 19, 2003. *Garry v. Grenier,* 2003 WL 21436217 (S.D.N.Y. 2003).

28.     While serving his sentence, GARRY moved to vacate his conviction on August 4, 2014 pursuant to C.P.L. § 440.10(1).

29.     After an evidentiary hearing on the motion, the conviction was vacated and a new trial was granted by Decision and Order dated March 22, 2017.

30.     On March 31, 2017, GARRY was released on bail pending retrial.

31.     Then on February 5, 2018, the indictment was dismissed against GARRY when the jury, at retrial, acquitted him of all charges.

**The Crime**

32.     On August 18, 1995, retired NYPD detective Oswald Potter was shot and killed during a robbery of a Bronx gambling parlor located in the back room of New Hope Grocery at 3581 Laconia Avenue.  He was killed after engaging in a struggle and exchanging gunfire with two armed perpetrators who entered the store/bodega.

33.     According to witnesses in the gambling parlor, the perpetrators  were described as a dark skinned or black male and a light skinned male Hispanic.  The Hispanic male announced a stick up, firing a shot into the ceiling. He then instructed Gladys Garcia, the clerk behind the counter, to fill a plastic bag with money.

34.     Potter grabbed the black male perpetrator, who was also armed.  A struggle ensued and Potter knocked the black male to the floor.  The Hispanic perpetrator chased Potter into the front room, and shot Potter in the chest.

35.     According to Garcia, the black male perpetrator retrieved the bag from her which contained approximately $500 in cash.  The men fled as Potter, although wounded, shot at them.

36.     Potter was rushed to the hospital and died from his gunshot wound. [1]

**The Shoddy Identifications and the Withholding, by Defendant Det. Milian, of Evidence About the Identifications**

37.     Defendant Detective GEORGE MILIAN of the 47 Precinct in Bronx was assigned to investigate the Potter murder.  MILIAN was assisted by Det. Peter Forcelli.[2]

38.     The police investigation culminated in two dubious eyewitness "identifications" of GARRY as being the light-skinned Hispanic male shooter.  GARRY'S photograph was one of many shown to witnesses by police, and it is believed that although innocent, GARRY may have resembled the Hispanic male shooter.

39.     Garcia, who made an "identification," only saw the Hispanic male perpetrator (who was wearing a hat) for a matter of ten or fifteen seconds (at *most*), in the presence of a weapon, during a violent robbery and shootout.

40.     While first viewing GARRY'S photograph at the 43rd precinct in a procedure conducted by MILIAN, Garcia did not positively identify GARRY. Instead, she merely stated, "[t]his looks like the guy."

41.     Despite the fact that it was not common practice to then show Garcia GARRY'S photograph again since doing so could potentially compromise any future identification, Det. MILIAN brought her to the Catch Unit to view his photograph (*the same photograph*) a second

---

[1] It was believed that one of the perpetrators was shot in the hand by Potter as he fled the scene. As a result, the police canvassed hospitals looking for a black or male Hispanic with a gunshot wound.

[2] Det. Forcelli is now head of national training for the Bureau of Alcohol, Tobacco and Firearms. Special Agent Forcelli has come to believe that GARRY was wrongfully convicted and testified for GARRY in his defense during the post-conviction litigation and at his retrial.

time.

42.    As would be expected based on her prior exposure to GARRY'S photograph, Garcia became more "certain" this time and identified GARRY.  By the time she viewed Garry in the lineup, her certitude had once again artificially increased.

43.    Antonio Vargas, the other eyewitness, also had minimal opportunity to view the perpetrator.  Vargas was sitting in a large delivery truck high above the ground reading a newspaper while his father went into the bodega to make a delivery. The perpetrators approached in their car and parked in front of him.  They exited their car and Vargas glanced up, noticing the Hispanic male's clothing.  The men then turned toward the store with their backs to him, and he returned to reading his newspaper until he heard a gunshot from inside the store and exited the truck.

44.    As his father ran out of the store, Vargas turned and ran back to the truck with his father, just as the perpetrators were running from the store to the getaway car. Vargas did not get a good look at the men as they were running; his best look was in the few seconds when they walked past his truck to enter the store before the crime.

45.    Like Garcia, Vargas was equivocal when first viewing GARRY.

46.    He also seized upon photographs of persons other than GARRY and stated that they looked like the Hispanic male perpetrator.

47.    But, this exculpatory information was never recorded by MILIAN, nor did he provide it to prosecutors. Consequently, this exculpatory information was never given to the defense.

48.    The next day, MILIAN (again, against protocol) showed Vargas a smaller

collection of photographs, which contained the same photograph of GARRY.   This time Vargas stated about GARRY'S photograph,  "this could possibly be the guy."

49.    Then falsely reporting the viewing on the previous day, MILIAN stated in a DD that Vargas did in fact pick GARRY'S photograph on the previous occasion, when he did not.

50.    When Vargas later viewed the lineup, he selected GARRY and was more affirmative, stating, "He's the guy, he's the one at the store when the cop got shot."

51.    Based on these weak "identifications" by Garcia and Vargas GARRY was arrested for the Potter murder on August 22, 1995.[3]  Notably, GARRY did not have a gunshot wound to his hand.

52.    Although the investigation continued for a short time thereafter while attempts were made to identify the black male perpetrator, the case was largely considered closed by GARRY'S arrest, and a task force assembled to work on the case was disbanded.

53.    The NYPD never made any arrests other than of GARRY for this crime.

54.    Both witnesses had limited and compromised opportunities to observe the Hispanic shooter at the time of the crime.   The event was fleeting and stressful. The Hispanic shooter was partially disguised, and he possessed and shot a firearm.   This added to the stress factor for Garcia and concerns for weapon focus.  In addition, Vargas was sitting high in a truck and was viewing the Hispanic male from an angle.

55.    Indeed, both Garcia and Vargas, through their own words, expressed lack of confidence in their initial photographic "identifications" and throughout, even though their level

---

[3] Given the high-profile nature of the case, Detectives MILIAN and Forcelli received commendations for GARRY'S arrest. Forcelli, now realizing that GARRY is innocent, renounced his commendation.

of certainty increased from multiple exposures to GARRY'S image – same photograph twice, line-up, and the in-court viewing for Garcia (Vargas did not make and in-court identification).

56.    And, as to the photographic procedures, the police acted improperly showing Garcia and Vargas GARRY'S photographic twice, which served to unfairly sure up the initial equivocal photographic "picks," and make the line-up (and court-room identification for Garcia) seem to the jury to be more certain and stronger than they were.

57.    Because the case rested on the two weak "identifications" of Garcia and Vargas (and the statement from a notoriously unreliable career jailhouse informant that GARRY purportedly confessed to him, which was elicited by ADA MacDonald post-indictment and is described further below), any information that could undermine Garcia's or Vargas' already dubious "identifications" of GARRY was material, and particularly important and useful to the defense to further undermine the remarkably weak case. There was no physical or forensic evidence linking Garry to the crime.  He did not make any inculpatory statements. In fact, he vehemently denied involvement in the Potter murder to the police, and he told the police, consistent with an alibi defense he raised at trial, that he was home when the murder occurred.

58.    Certainly, Vargas' comments that people he viewed, other than GARRY, could also be the male Hispanic shooter were particularly significant, especially in light of his uncertainty that Garry was the shooter.

59.    Thus, the failure of MILIAN to document and disclosure Vargas' reference to others as potential suspects and whom Vargas apparently described in terms similar to how he described GARRY, violated the *Brady* rule, which includes evidence that undermines the reliability of an identification, *Smith v. Cain*, 565 U.S. 73, 75-76 (2012), impeachment material,

*Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Bagley*, 473 U.S. 667 (1985), and information that discredits the caliber of the police investigation. *Kyles v. Whitley*, 514 U.S. 419, 446 (1995).

60.     Moreover, GARRY was prejudiced as a result of the *Brady* violation and confidence in the outcome of his trial was undermined.  *Kyles,* 514 U.S. at 434.

**Prior to Trial Someone Else Confesses to Shooting Potter,**
**and ADA MacDonald Withhold this Evidence**

61.     In early 1996, Det. Forcelli was transferred from the 47th precinct to the 45th precinct. There, he began investigating the homicide of Keith Ralph, who was disemboweled in a Coop City stairwell on August 9, 1995, nine days before the Oswald Potter murder.

62.     Stephen Frances Martinez was believed to be the perpetrator. Forcelli and his partner from the 45, Det. Joe Russell, met on numerous occasions with an informant Derek Nicholson, to develop information about Martinez.

63.     At one such meeting which occurred in Forcelli and Russell's police cruiser, the informant told them that Martinez had admitted his involvement in a robbery which occurred in a bodega in "the valley" (a specific area of the 47th precinct covering the site of the Potter murder), where somebody was shot and possibly killed.  Det. Forcelli immediately recognized those facts to be consistent with the Potter murder which he had also investigated.

64.     To  sure up his belief, Forcelli utilized the NYPD's Computer Assisted Robbery Search System ("CARS"), which contained information on all robberies reported within the five boroughs.  Forcelli input parameters related to information provided by Martinez to the informant ("robbery," "shots fired," "injury or death," and "grocery store") and specified the location as the 47th precinct, and a two-year time period from 1994 to 1996 (straddling the

August 18, 1995 Potter homicide).  The only crime matching that description in CARS was the

Oswald Potter murder.

65.     Det. Forcelli later sought additional information from the informant regarding

Martinez's admissions.  A June 12, 1996  police report (DD5) drafted by Forcelli documented

his conversation with the information that same day.  It stated that the informant told Forcelli:

> While in Marilyn's house last summer [the summer of 1995], Steve Martinez
> came into the apartment sweating and apparently 'flustered' stating "I just shot
> some guy on Laconia Avenue."  [The avenue where the Potter murder occurred].
> Martinez then brandished a Ruger 9mm (per the subject's knowledge of guns) as
> if to show off the weapon he used.

66.     Forcelli considered Martinez's statement to be a "confession" to the Potter

homicide.  He included in the DD5 the informant's description of Martinez's demeanor as

sweating and "flustered" when he made the statement because to Forcelli it was an indication of

reliability.  Forcelli then followed up by speaking with Marilyn, who confirmed that Martinez

had confessed as reported by the informant.

67.     Det. Forcelli also requested that the NYPD's latent print unit compare Martinez's

prints to those lifted in the Potter homicide, and notified detectives at the 47th precinct where the

Potter murder occurred that Martinez was a suspect.

68.     Finally, Det. Forcelli informed ADA MacDonald, who was assigned to both the

Ralph and Potter homicides, of the evidence he obtained implicating Martinez in the Potter

murder.  Forcelli testified that he had "lengthy" and "hearty" discussions with ADA MacDonald

when they met twice in June of 1996 and that they discussed the Potter homicide in "excessive

depth."

69.     ADA MacDonald's notes indicate he acted on the information Det. Forcelli

provided about Martinez and that ADA MacDonald or someone else in law enforcement obtained Martinez's mugshot and sent it to a detective at the 47th precinct for a possible photo array to be shown to the witnesses on the Potter case.

70.     ADA MacDonald would later testify at a post-conviction hearing that he did not know if Martinez's photograph was ever shown to witnesses, or if any follow-up work was done with Martinez evidence.

71.     No reports or notes indicate that any further work was done to investigate or prosecute Martinez.

72.     Martinez not only confessed to being the shooter, he is also light-skinned Hispanic male and met the description of the shooter. Given that GARRY was also a light skinned Hispanic male and his role in the offense was that of the shooter, it would have been apparent to ADA MacDonald, who was the trial assistant that Martinez was an alternate perpetrator.

73.     Nevertheless, and even though ADA MacDonald received the exculpatory Martinez evidence from Det. Forcelli prior to GARRY'S trial, the evidence was never provided to GARRY or his counsel. Consequently, this exculpatory information could not be further investigated or used by the defense at trial to develop and/or advance a third-party culpability defense.

74.     No one other than GARRY was ever prosecuted by the BCDAO for the Potter murder.

75.     There can be no doubt that Martinez's confession was exculpatory and was required to be disclosed under the *Brady* rule.  In finding a *Brady* violation, Justice Michael

Gross, who presided over the 440 hearing stated:

> Since Martinez's statement may have implicated someone other than defendant in the murder of Oswald Potter, it constituted exculpatory evidence under the *Brady* doctrine *(see People* v. *Robinson,* 133 A.D.2d 859 [2d Dept. 1987] [witness's statement directly implicating three men other than defendants as    perpetrators constituted important exculpatory information discoverable under *Brady*]).
>
> ***
>
> Despite [some] differences, there were major similarities between Martinez's statement and the Potter murder. Martinez admitted to shooting a man in the same temporal and geographic proximity as the Potter murder. He also stated that the shooting occurred during the robbery of a grocery store -the exact facts in the Potter case. Moreover, Forcelli testified that aside from the Potter case, no either case fit this description within a two-year period. Additionally, Martinez matched the general description of Potter's shooter -- light-skinned male Hispanic with a goatee and large nose.

Decision Granting New Trial, Mar. 22, 2017; *See also People v. Negron* 26 N.Y.3d 262 (2015) ("general resemblance" of a person from the same building who was arrested in "close proximity" to the shooting with weapons and ammunition of the same type used in the crime demanded disclosure the defense for use at trial.).

76.     It is equally clear that in the context of this weak case, the Martinez evidence was material, and that the failure to disclose it prejudiced GARRY and undermined confidence in the outcome of his trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

77.     The 440 Court also found that GARRY was prejudiced by the non-disclosure under the "reasonable possibility" of a more favorable result standard because defense counsel made a specific request for the material, and alternatively under the "reasonably probability" standard, the more demanding standard if only a general request had been made. Dec., at 57-63.

### The Prosecution's Use of a Known Unreliable Jailhouse Informant, and the Failure to Disclose Evidence about his Lack of Credibility

78.     GARRY was tried in October and November, 1997.

14

79.    Because the prosecution's cases relied *only* on the thin "identifications" of Garcia and Vargas, ADA MacDonald was desperate.

80.    To get an unfair leg up, he decided to use Lorel Huffman as a trial witness. Huffman was a notorious unreliable career jailhouse informant, who claimed without any corroboration, that Garry confessed to him while they sat together in the court pen at the Bronx criminal court.

81.    Huffman became  a "go to" informant for prosecutors in the BCDAO and in other prosecutors' offices before and after GARRY'S trial, and was shuffled around New York City jails. Huffman also derived substantial financial benefits and sentence reductions by testifying for  prosecutors  in numerous cases.[4]

82.    At GARRY'S  trial,  Huffman  claimed  that  GARRY'S  was  one  of  many spontaneous murder confessions supposedly made to him within a single four-month period. ADA MacDonald, knew or should have known that Huffman, was not credible, and that his testimony was perjurious.

83.     ADA MacDonald was aware of information directly related to Huffman's lack of credibility that he failed to disclose to the defense for impeachment purposes.

84.    ADA MacDonald also turned a blind-eye to Huffman's obvious unreliability and despite the apparent need to investigate Huffman's past, ADA MacDonald  failed to conduct even the most rudimentary of investigations to assess Huffman as a witness, to avoid having to provide

---

[4] His exploits as a career informant are well documented in a lengthy 2003 Newsday article, "Catching on to the con man: Pathological informer took justice system on long ride." Sean Gardner, Newsday, 12/6/03. His outlandish claims include his having once told law enforcement that he could lead them to Jimmy Hoffa's body.

exculpatory information about his past to the defense.

85.    Garry was convicted after trial of murder and two counts of robbery.

86.    Huffman has since recanted his trial testimony in GARRY'S case a number of times.

87.    In a series of letters in 2001 and 2002 to the BCDAO and the Court, Huffman revealed that prosecutors, including ADA MacDonald, were aware of his past history of mental illness, and his long history of fabricating information against criminal defendants and falsely testifying against them.

88.    Huffman also explained that this exculpatory evidence as well as notes he took that enabled him to falsify testimony against GARRY, among other things, was withheld from the defense.

89.    In 2002, GARRY brought a 440 motion based on Huffman's recantation and was granted a hearing, but the motion was later dismissed after Huffman's court-appointed attorney informed the court that he would invoke Huffman's Fifth Amendment privilege to remain silent.[5]

**The Investigation by the United States Attorney's Office and the 2008 440 Hearing**

90.    Years later, a federal investigation revealed that the gambling parlor robbery and Potter murder was perpetrated by four men.

91.    The investigation began when Lawrence Broussard was arrested in 2004 for gun possession in the Bronx, and as part of the "trigger-lock program" was transferred to federal court where he began proffering with the United States Attorney's Office for the Southern

---

[5] Due to his obvious lack of credibility, the prosecution agreed by stipulation not to rely on him at the 2014 to 2017 440 proceeding that led to the new trial, essentially nullifying his evidentiary value.

District of New York ("USAO") and Detective Michael DiPaolis of the NYPD.  During the proffering process, potential federal cooperators are thoroughly vetted.  They are required to disclose their involvement in the crimes under investigation and that of others and all criminal activity they have committed whether or not charged. The USAO endeavors to verify their information by multiple interviews, independent investigation, and comparing what they learn from other cooperators. If it is discovered that a cooperator knowingly provides untruthful information, they lose the benefit of a reduced sentence under a plea and cooperation agreement.

92.    In Broussard's proffers, he informed the USAO that he and three other individuals were responsible for the Potter murder:  Brent Mason, "Pito," and a Hispanic male know as "Flip." In 2008, Broussard identified Brent Mason and Jose Marrero ("Pito") from photo arrays as participants in the crime. Mason who also cooperated and identified Broussard and Marrero in photo arrays as co-perpetrators in the Potter murder.  Broussard and Mason were shown photo arrays containing GARRY's photograph, but neither identified GARRY.[6]

93.    Mason's and Broussard's negative identifications were the basis of a 440 motion filed in 2008 which led to an evidentiary hearing.

94.    The only witness to testify at the 2008 440 hearing was Detective Michael DiPaolis of the NYPD, who had been involved in Broussard and Mason's proffers and showed them the GARRY photo array.  Neither Mason nor Broussard had yet been sentenced in federal court and were declared unavailable for the hearing.  In the opinion denying the motion, the court acknowledged "that the negative identifications tend to exonerate the defendant" and it was "certainly *possible* that a jury presented with the negative identifications could return a verdict of

---

[6] Marrero refused to cooperate with the USAO, but pled guilty in 2010 to a firearms charge related to the Potter homicide and was sentenced to five years.

not guilty." However, it found that the negative identifications did not, in and of themselves, create a *probability* of a more favorable outcome for GARRY.

**The CPL § 440 Motion and Hearing that Led to Vacatur of the Conviction and Retrial**

95.     GARRY contacted The Exoneration Initiative ("EXI") in 2010 to reinvestigate his case. As part of that reinvestigation, EXI submitted a FOIL request to the NYPD for police records. In response, the NYPD disclosed a fingerprint report which indicated that on June 18, 1996, the NYPD's latent print unit compared fingerprints found at the crime scene to those of Stephen Martinez. Although the results of the comparison were negative (as were the results of comparison to GARRY's fingerprints), the report was an indicator – the *first* in almost 20 years of litigation on GARRY's case – that police had had reason to suspect Martinez as a perpetrator for the Potter murder.

96.     Notably, aside from GARRY and Potter, Martinez was the only other person whose fingerprints were ever compared with latent prints from the Potter crime scene. Given the obvious connection that the shooter was a Hispanic male and Martinez is Hispanic, this revelation sparked the defense's focus on Martinez as potentially being the person who shot Potter (the role ascribed to Garry). The USAO also reopened its own reinvestigation of the Potter murder.

97.     Working together, EXI provided the fingerprint report to John O'Malley, an investigator at the USAO.[7] O'Malley obtained copies of Martinez's Rap Sheet and arrest photographs and confirmed that Martinez met the trial eyewitnesses' descriptions of the light-

---

[7] Martinez's name was redacted from the fingerprint report EXI obtained under FOIL by NYPD; only his NYSID number was visible. Using that number, EXI was able to ascertain his name, which was later confirmed by O'Malley's investigation.

skinned Hispanic male perpetrator who they had identified as GARRY. O'Malley also generated a photographic array with Martinez as the target.

98.    Then on April 15, 2014, O'Malley flew to the state where Broussard resided, met him in the airport, and showed him the array.  Immediately, Broussard stated, *without hesitation*, "that's Flip" (the Hispanic male shooter), and pointed at the person in position four (the photograph of Steven Chapman, a/k/a "Stephen Martinez").

99.    Following Broussard's identification of Martinez, GARRY filed another C.P.L. § 440 motion on August 4, 2014.  A hearing was granted which commenced in Bronx Supreme Court on November 18, 2015.[8]

100.    Testimony was offered at the hearing by Special Agent Peter Forcelli, Lawrence Broussard, former Assistant United States Attorney Avi Weitzman, John O'Malley, former ADA MacDonald, Jose Marrero, Garry's original trial attorney Lawrence Sheehan, Mark Uner, a custodian of record from the Minnesota prison where Martinez was located during the 440 litigation. The Court was also provided with a post-arrest video of Marrero who was rearrested and discussed GARRY's innocence of the Potter murder, and audio-recordings of Stephen Martinez's prison telephone calls with a reporter from the New Yorker who was covering the story.

101.    Broussard testified that he did not know Flip before the robbery and never knew Flip's real name in 1995 when they committed the Potter crime together.

102.    He was sure that Martinez, who he recognized and identified in the 2014 photo

---

[8] A previous and partial hearing was held before Justice Richard Lee Price. However, due to Judge Price's medical condition the case was transferred to Justice Michael Gross.

array shown to him by O'Malley, was Flip.

103.    Then, looking at GARRY in the courtroom, Broussard said for certain that GARRY was *not* Flip, and that GARRY was *not* the person who robbed the gambling parlor with him in 1995 and shot and killed Oswald Potter.

104.    Jose Marrero did not cooperate in the federal reinvestigation, and he refused to speak with the defense during the course of EXI's investigation.  However, he testified at the 440 hearing under court order and was granted transactional immunity from state prosecution for the Potter murder.

105.    Marrero testified that he drove the getaway car during the commission of the crime.  And, although his testimony was inconsistent with Broussard's and Mason's accounts about some of the details of the crime, including whether the Hispanic male was shot in the hand, Marrero swore that he had never seen GARRY before, and he stated unequivocally that GARRY was not the fourth participant in the Potter homicide.   Indeed, Marrero was adamant that GARRY was too young to be the fourth perpetrator because all of the perpetrators including Marrero were much older.

106.    Shortly after his testimony at the 440 hearing, Marrero was arrested by federal authorities for gun possession and drug trafficking.  Admitted into evidence at the 440 hearing was a videotaped interview with Marrero and the FBI and NYPD made after the new arrest.  During the interview Marrero, *sua sponte*, raised the Potter case and GARRY's innocence.  He told his questioners that GARRY "wasn't there with us."   And, harkening back to his 440 testimony he said, "[f]ortunately they decided to take his case, they subpoenaed me, and they gave me immunity, and I said the truth and I hope they let that kid go, that shit bothered me for

twenty one years.  That kid is still locked up he didn't even do that shit man."

107.    During the hearing, the USAO (which was conducting an ongoing reinvestigation into the Potter homicide) disclosed to the prosecution and defense recordings of telephone calls between Stephen Martinez, currently incarcerated in Minnesota, and Stephanie Clifford, a reporter who was writing a story for the New Yorker.  In the recordings, Clifford questioned Martinez about the Potter homicide, and he provided her with a specific and detailed *false alibi* in which he claims to have been living in California from January of 1995 through 1997.

108.    However, it was undisputed and documented in Martinez's RAP sheet and in a police report that he was in fact living in the Bronx during the summer of 1995, when the Potter and Ralph homicides took place.

109.    Martinez also opined that GARRY is probably innocent.  And, hedging his bets about the possibility of evidence linking him to the Potter murder, he said that he had probably been at the Laconia Avenue gambling parlor before, since he frequented gambling parlors and often spent time in that neighborhood.

110.    GARRY's trial counsel Lawrence Sheehan testified and confirmed without any doubt that he was never apprised of Martinez's culpability for the Potter murder by anyone, despite his specific requests for discovery which would have encompassed this information.  He stated that if he had received this information, he would have investigated it and moved to admit Martinez's confession into evidence as an exculpatory declaration against penal interest in support of an alternate perpetrator defense at trial.

111.    Special Agent Peter Forcelli testified about the background of his 1996 investigation into Martinez as a perpetrator of the Potter murder.  He discussed the informants he

relied upon and described the steps he took to corroborate the information.

112.    Forcelli stated that he had no doubt, based on his numerous conversations with the informant and others, and his use of the CARS database, that the homicide to which Martinez was confessing – which occurred on Laconia Avenue, in the summer of 1995, in a bodega, where a man was shot and possibly killed – was in fact the Potter homicide. He also testified that as a law enforcement officer with thirty years of experience, as someone with knowledge of the investigations relevant to this case, as one of the detectives who arrested GARRY in 1995 for the homicide of retired NYPD detective Oswald Potter, he believes that GARRY was misidentified and is actually innocent of this crime.

113.    By Decision and Order dated March 22, 2017 Justice Michael Gross held that GARRY was entitled to a new trial because exculpatory material about the Martinez confession was withheld in violation of GARRY's right to due process of law.

114.    On March 31, 2017, GARRY was released on bail pending retrial.

## The Retrial

115.    Retrial commenced in late January 2018 and ended with a full acquittal on February 5, 2018, causing the indictment and all charges against GARRY to be dismissed.

116.    Throughout the new trial, the defense argued that GARRY was innocent.  He contended that he was not present when the crime occurred and that it was a case of mistaken identification; that NYPD and the prosecution failed to investigate evidence of the true killer, Stephen Martinez, even though they had his confession to the Potter murder prior to Garry's initial trial; and that they covered up the exculpatory evidence and frustrated the USAO and EXI's ability to reinvestigate.

117.    The prosecution's case essentially rested on the testimony of Gladys Garcia and Antonio Vargas. MILIAN, who was retired, testified for the prosecution.

118.    At retrial, GARRY put on a defense and called a number of witnesses. John O'Malley, from the USAO, testified about his investigation with EXI and its focus on Stephen Martinez as an alternate perpetrator. He provided the chronology of the reinvestigation, the cooperation of Lawrence Broussard and Brent Mason, and the arrest of Jose Marrero. He explained that records showed that Martinez was living in the Bronx around the time of the Potter murder and was not in jail when it happened. And, he learned that Martinez is a light-skinned Hispanic male as initially described by Garcia and Vargas.

119.    Avi Weitzman, who had left the USAO and was in private practice, testified that during the reinvestigation, doubts arose about whether GARRY was the male Hispanic shooter.

120.    Derek Nicholson testified through a videotaped disposition from his home state of Georgia. He denied making the statement to Agent Forcelli in 1996 that Martinez entered Marilyn Walter's apartment in the summer of 1995 and waived a gun around and said I just "shot a guy on Laconia Avenue." However, he acknowledged that he did hang out in Marilyn's apartment around that time with Steven Martinez.

121.    Special Agent Forcelli testified that Nicholson did in fact make that statement to him and that he documented it contemporaneously in a police report. Forcelli also testified that he connected Martinez's statement to the Potter murder, and that he told MILIAN and Bronx ADA MacDonald about it prior to GARRY's trial.

122.    Agent Forcelli testified emphatically that he believed Martinez, not GARRY, shot and killed Potter.

123.    Jose Marrero also testified for the defense.  He provided a detailed account of the events from his perspective as getaway driver which was consistent with the renditions offered by prosecution witnesses.  And, he stated unequivocally that he did not know GARRY, that GARRY was much younger than the Hispanic male shooter, who was more than a decade older than GARRY at the time, and that GARRY was innocent.

124.    After only 30 minutes of deliberations, the jury returned a verdict of not guilty, finally ending the wrongful prosecution of GARRY.

**Plaintiff's Injuries and Damages**

127.    As a direct and proximate consequence of the aforementioned actions by the Defendants, Plaintiff suffered almost 22 years of imprisonment.

128.    Plaintiff also suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit.  He was denied effective treatment for his emotional injuries while incarcerated, and continues to suffer mental anguish to this day.

129.    Plaintiff is afraid to be in crowds and gets nervous using public transportation.

130.    It is very hard and anxiety provoking for him to understand and use technology which was passed him by during his incarceration.

131.    Plaintiff was denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family and friends.

132.    Plaintiff is also struggling to gain the trust of other family members and to repair broken relationships.

133.    It is now difficult from him to have healthy relationships with woman.

134.    Elders in Plaintiff's family died during his incarceration.

135.    It has been extremely difficult for Plaintiff to obtain meaningful employment due to his lengthy incarceration.

136.    Similarly, Plaintiff was denied years of gainful employment and income.  His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

137.    Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated.  Nothing can undo the reputational damage he has sustained.

138.    Plaintiff incurred legal costs.

139.    Plaintiff was denied fundamental constitutional rights and has lost his faith in the American justice system.

## **FIRST CAUSE OF ACTION**

**(42 U.S.C. § 1983 and New York State Law; Malicious Prosecution Against GEORGE MILIAN and The CITY OF NEW YORK)**

140.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

141.    MILIAN initiated, or caused the initiation of, criminal proceedings against Plaintiff when he provided information to prosecutors implicating GARRY in the Potter murder and bodega robbery.

142.    MILIAN initiated this prosecution without probable cause.

143.    As to Garcia, MILIAN told prosecutors that her initial photo "pick," where she said GARRY'S picture "looks like" the Hispanic male perpetrator, was an actual identification when in fact it was not.  Rather, it was nothing more than a musing and should have steered the investigation away from GARRY (which MILIAN failed to disclose to prosecutors). And,

instead, MILIAN went in the improper direction of showing Garcia the same photograph of GARRY again, and then presented him to Garcia at a line-up, to manipulate her non-identification into a usable identification (which MILIAN also failed to disclose to prosecutors).

144.    As to Vargas, MILIAN falsely reported to prosecutors that he made a positive identification of GARRY when he first viewed photographs, he failed to disclose to prosecutors that Vargas was  far from certain that GARRY was a perpetrator during a subsequent photographic procedure (and in a line-up), and that he expressed similar equivocations about other potential suspects he had viewed in photographs.

145.    Had MILIAN followed proper police procedure, the only evidence against GARRY would have been two witnesses saying that GARRY somewhat resembled a perpetrator. This would never have been enough to obtain an indictment. But instead he used improper police techniques to create the illusion of stronger identifications, which were then used to secure an indictment and then misled the prosecution about what actually occurred.

146.    MILIAN also initiated this prosecution with malice in that he deliberately used improper police procedures to turn equivocal non-identifications into identifications and then – recognizing his wrongdoing – hid it from the prosecution and grand jury.

147.    The prosecution terminated in GARRY's favor when his convictions were eventually vacated and the indictment against him dismissed.

148.    The acts and conduct of the defendants constitute malicious prosecution in violation of GARRY'S rights under the United States Constitution, and is a tort under New York State law.

*149.*    The CITY OF NEW YORK is liable under state law for MILIAN's tortious

actions under the doctrine of *respondeat superior.*

## SECOND CAUSE OF ACTION

### (42 U.S.C. §1983; Denial of Due Process and a Fair Trial and Prosecution Against GEORGE MILIAN)

150.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

151.    MILIAN lied about the nature of the non-identifications by Garcia and Vargas and used improper identification procedures to manipulate them to identify GARRY, and he then hid this information from the prosecution and thus hid it from GARRY and his defense attorney.

152.    The identifications of GARRY were extremely thin, and thus the use of improper identification procedures to manipulate the non-identifications into identifications were *Brady* material and relevant and material GARRY's defense case.

153.    Indeed, at retrial, after the truth came out and was available to GARRY's defense counsel, the Jury acquitted GARRY in only 30 minutes. This proves the withheld *Brady* evidence was material.

154.    Further, MILIAN created the false impression that the identifications were stronger than they actually were, and undoubtably influenced the grand and petit juries, contributing to GARRY's indictment, prosecution, and conviction.

155.    Thus, MILIAN's actions deprived GARRY of due process and a fair prosecution and trial, which is a violation under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

## THIRD CAUSE OF ACTION

**(State Law; Violations of the New York State Constitution Against GEORGE MILIAN and
The CITY OF NEW YORK)**

156.    Plaintiff repeats and realleges each and every allegation contained in the
preceding paragraphs above as if fully set forth herein.

157.    By virtue of the aforementioned acts, MILIAN is liable to GARRY for violating
his right to due process and to a fair trial under Article I, § 6 of the New York State Constitution,
and his right to be free of unreasonable and unlawful searches and seizures under Article I, § 12
of the New York State Constitution.

158.    Defendant CITY OF NEW YORK is liable for these violations of the New York
State Constitution under the principle of respondeat superior.

## FOURTH CAUSE OF ACTION

**(42 U.S.C. § 1983; *Monell* Municipal Liability for the Conduct of Prosecutors in the
BCDAO Against the CITY OF NEW YORK)**

159.    Plaintiff repeats and realleges each and every allegation contained in the
preceding paragraphs above as if fully set forth herein. Prior to and during GARRY's first trial in
1997, the BCDAO and ADA MacDonald were aware that Stephen Martinez had confessed to the
Potter homicide.

160.    ADA MacDonald was informed of this confession by Detective Peter Forcelli.

161.    Forcelli told ADA MacDonald that he had learned of this confession from two
separate reliable sources, who had both witnessed Martinez's confession.

162.    Forcelli also documented Martinez's confession in DD5's that he turned over to
ADA MacDonald before GARRY's first trial.

163.    Forcelli testified that he had "lengthy" and "hearty" discussions with ADA MacDonald when they met twice in June of 1996 and that they discussed the Potter homicide in "excessive depth."

164.    ADA MacDonald's notes indicate that he or someone else in law enforcement obtained Martinez's mugshot and sent it to a detective at the 47th precinct for a possible photo array to be shown to the witnesses on the Potter case.

165.    However, ADA MacDonald did not recall if the photo array was ever shown to any witnesses.

166.    Martinez, like GARRY, is a light skinned Hispanic male.

167.    The Brady evidence about Martinez's confession was never turned over to GARRY or his defense counsel.

168.    The BCDAO, in addition to failing to disclose Martinez's confession, committed further Brady violations at GARRY's first trial.

169.    ADA MacDonald recognized that the case against GARRY was weak and he might not be able to secure a conviction. So he took affirmative steps to bolster the case by going to Lorel Huffman a known prison informant and "go to" man for prosecutors within the Bronx DA who needed to improve their cases.  To enable the use of Huffman, ADA Huffmans failed to turn over evidence he knew about Huffman's unsavory past that impacted his credibility. Demonstrating a reckless disregard for the truth Huffman was purposely unvetted by ADA MacDonald, despite clear red flags about his credibility – including finding documentation available within the BCDAO that would have undermined his testimony. This deliberate lack of vetting also enabled ADA MacDonald to avoid having to turn over information about Huffman's

unreliability that ADA MacDonald knew or should have known, even though there are likely others, who were aware and should have turned this Brady information over to GARRY's defense counsel, or directed ADA MacDonald to do the same.

170.    Ineptly justifying his conduct in the GARRY case, and giving a window into the culture of convictions over truth that prevailed in the BCDAO, ADA MacDonald was quoted in the 2003 article admitting to a culture at the BCDAO to get a conviction any way they could and turning a blind eye to obvious red flags:

> My sense is if you've got information, you've got evidence and it satisfies the bare minimum of relevancy, materialness, corroboration, reliability, you almost have a duty, in my mind, to give it to a jury and decide whether it's acceptable or not.

171.    These Brady violations committed by the BCDAO's office which cost GARRY nearly 22 years of his life are just some of many in a long and persistent history of feckless training and discipline related to Brady violations.

172.    In fact, the BCDAO office has shown a pattern and practice of intentionally and deliberately withholding Brady evidence.

173.    This widespread pattern reflects an understanding by supervisors and line prosecutors at the BCDAO that protecting constitutional rights was secondary to obtaining convictions.

174.    Individually and collectively, the violations by ADA MacDonald and other BCDAO personnel of Plaintiff's constitutional rights and their prolonging of Plaintiff's injuries were directly, foreseeably, proximately, and/or substantially caused by conduct chargeable to Defendant City of New York amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to investigation and prosecution by the BCDAO under the

leadership of the Bronx County District Attorney ("D.A.") ROBERT JOHNSON.

175.    ROBERT JOHNSON and his authorized delegates at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the management of personnel employed by or assigned to the BCDAO.

176.    ROBERT JOHNSON, at all relevant times, was an elected officer of Bronx County, and the BCDAO was and is funded out of the City of New York's budget.

177.    The DA was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

178.    The DA and his assistant district attorneys are agents and employees of Defendant City of New York.

179.    Although the obligation to disclose Brady material and to correct false or misleading evidence is an ongoing one, the BCDAO, following GARRY's conviction and during his numerous appeals, continued to withhold their knowledge of the aforementioned confession by Martinez.

180.    Even after GARRY's discovery of Martinez's confession, the BCDAO has continued to deny that any Brady violation ever occurred in Plaintiff's criminal prosecution.

181.    The State of New York has provided by statute that Defendant City's constituent counties (including Bronx County), and hence Defendant City itself, are liable for torts committed by County officers and employees, such as the DA and his assistants.  See N.Y. County Law §§ 53, 941.

182.    The City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

183.    Under the principles of municipal liability for federal civil rights violations, the DA or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the BCDAO Office regarding their conduct in the prosecution of criminal matters, including, but not limited to:

    a.    their constitutional obligation not to create or to otherwise use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including but not limited to manufactured lineup identifications and in-court identification testimony;

    b.    their constitutional obligation to correct evidence, testimony, statements, and argument that they know or should know is false, inaccurate, incomplete, misleading, or unreliable, when it is presented or thereafter; and

    c.    their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in Brady, Giglio, and their progeny.

184.    The DA or his authorized delegates maintained a policy, custom, or practice of deliberate indifference to past violations by BCDAO employees of these constitutional obligations, to the risk of future such violations by BCDAO employees, and the obvious need to train, supervise, and discipline BCDAO employees with respect to these obligations.

185.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the D.A. and his delegates, who knew:

   a.  to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases, such as Brady issues;

   b.  that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

   c.  that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the BCDAO places on prosecutors to win convictions at any cost;

   d.  that the wrong choice by municipal employees concerning Brady issues will frequently cause the deprivation of the constitutional rights of the accused and cause them constitutional injury; and

   e.  that employees of the BCDAO had a history of making wrong choices in such matters, specifically related to *Brady* violations.

186.   The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

   a.  numerous credible allegations in the form of secondary sources[9] and civil lawsuits, many substantiated by judicial decisions (some of which are listed in Exhibit A and Exhibit B, which are incorporated herein by reference) that the BCDAO had:

---

[9] *See Cordero v. City of New York*, 282 F. Supp. 3d 549, 563–64 (E.D.N.Y. 2017) ("Newspaper articles, reports, and other documents may provide sufficient documentary evidence for *Monell* liability.").

    i.   failed to disclose information favorable to the defense that was required to be disclosed by *Brady*, the constitutions and the laws of the United States and of the State of New York; and

    ii.   participated in the manufacturing of false testimony or evidence, including identification evidence;

    iii.   presented or failed to correct false or misleading testimony and argument;

    iv.   made arguments at trial that were so false, misleading, or otherwise improper that they deprived the defendant of due process and a fair trial; and

    b.   the inherent obviousness of the need to train, supervise, and/or discipline ADAs in the aforementioned constitutional obligations to counteract the pressure that the BCDAO applied to prosecutors to obtain convictions.

187.    During all times material to this complaint, the City and the BCDAO, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of criminal suspects or defendants and of other members of the public.

188.    However, the D.A. and his designees, as policymakers for the City, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

189.    Perhaps the greatest example of the systemic nature of the BCDAO's endemic Brady violations prior to 1997 came to light during the litigation of *Ramos v. City of New York*, 285 A.D.2d 284, 307 (2001) ("Plaintiff's theory of § 1983 liability relies in part on the contention that the District Attorney's Office exhibited a pattern of conduct, especially but not limited

to Brady violations, that deprived him of his federal constitutional rights. The theory has support in precedent (see, *Walker*, supra [Brooklyn District Attorney's history of Brady violations valid basis for § 1983 liability]; accord *Babi–Ali*, supra, at 274 [Queens District Attorney's history of Brady violations and citations therein]). Hence, plaintiff should be entitled to relevant information cited in his second supplemental demand for discovery and inspection, after in camera inspection and redaction by the court if necessary, pertaining to the alleged pattern including other Brady violations, including information relating to internal discipline or other remedial action taken in that regard, matters directly relevant to plaintiff's theory of liability.").

190.    As part of the *Ramos* litigation, the court compelled the "Bronx District Attorney's Office to disclose personnel records for prosecutors involved in seventy-two cases in which courts had found improper behavior by prosecutors from 1975 through 1996, and to submit to oral depositions about the Office's 'disciplinary' practices." Joel B. Rudin, The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong, 80 Fordham L. Rev. 537, 544 (2011).

191.    Discovery during Ramos revealed that the BCDAO, although "employing nearly 400 prosecutors and hundreds of support staff, has no published code or rules of behavior for prosecutors, no schedule of potential sanctions for misbehavior or objective standards governing when such sanctions will be imposed, no written or formal procedure for investigating or disciplining prosecutors, and no procedure for keeping a record of prosecutors who have been cited for or are known to have engaged in improper behavior. Officials could not identify even one prosecutor since 1975 who, according to the Office's records, has been disciplined in any respect for misbehavior while prosecuting a criminal case. Officials claim that several

35

prosecutors have been verbally chastised, or temporarily denied raises in compensation, but there is no apparent record of it." *Id.*

192.    The investigation of the New York State Bar Association's Task Force on Wrongful Convictions released in 2009 found that "government practices" – referring to a range of errors and misconduct by police and prosecutors, including false testimony and the failure to disclose to the defense information mandated by *Brady v. Maryland*, 373 U.S. 83 (1963) – contributed to more than 50% of the 53 New York wrongful convictions studied by the Task Force. (NYSBA Report at 19).[10]  In addition, the Task Force identified a much larger number of cases that "d[id] not reveal an actually innocent person being wrongfully convicted," but "nonetheless often reveal[ed]" a pattern of "troubling due process violations that may result in a defendant being denied a fair trial." (*Id.*).

## **FIFTH CAUSE OF ACTION**

### **42 U.S.C. § 1983 and Monell. Municipal liability for the conduct of employees of the NYPD. Defendant City of New York.**

193.    GARRY repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

194.    The failure of Det. MILIAN to accurately report the nature of Garcia and Vargas initial non-identifications, MILIAN'S failure to document and disclose Vargas' selection of other individuals he viewed in a photo array as potential suspects (who, according to him, resembled the Hispanic individual he observed at the time of the murder) and whom Vargas described in

---

[10] Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, April 4, 2009 ("NYSBA Report") (available at http://www.nysba.org/Content/NavigationMenu42/April42009HouseofDelegatesMeetingAgenda Items/FinalWrongfulConvictionsReport.pdf).

terms similar to how he described GARRY, MILIAN'S failure to reveal that the improper identification procedures were used to manipulate the non-identifications of Garcia and Vargas into identifications violated the *Brady* rule, which includes evidence that undermines the reliability of an identification, *Smith v. Cain*, 565 U.S. 73, 75-76 (2012), impeachment material, *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Bagley*, 473 U.S. 667 (1985), and information that discredits the caliber of the police investigation. *Kyles v. Whitley*, 514 U.S. 419, 446 (1995).

195.    MILIAN also testified falsely at trial about the true nature of the non-identifications, the extent of the witnesses' equivocations, and the use of improper tactics to manipulate non-identifications into identifications.

196.    Police Commissioner and police officers employed by the NYPD are agents and employees of Defendant City of New York.

197.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters, including but not limited to requirements governing:

      a.   the constitutional obligation not to withhold *Brady* or exculpatory evidence for use against criminal suspects and defendants in criminal trials and other proceedings;

      b.   the constitutional obligation not to give false or misleading testimony; and

      c.   the constitutional obligation not to initiate or continue a prosecution without

probable cause.

198.    During all times material to this complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates that would result in the violation of the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

199.    These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

200.    At the same time as NYPD policymaking officials were deliberately indifferent to constitutional violations by their employees, these officials created substantial incentives for their employees to commit such constitutional violations, by pressuring police officers to "close" cases through arrests, indictments, and convictions.

201.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for Defendant City— including but not limited to the Police Commissioner—who knew, or should have known:

     a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation of criminal cases;

     b.    that such issues present NYPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

     c.    that NYPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on NYPD employees to make

arrests, close cases, and secure indictments and convictions;

d.  that the wrong choice by NYPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

e.  that NYPD employees had a history of making wrong choices in such matters.

202.  At the time of GARRY's arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD employees that would violate the constitutional obligations identified above.

203.  Policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the difficult issues that regularly arise for police officers, specifically NYPD officers, during identification procedures and other phases of criminal investigations.

204.  A number of New York cases overturning convictions or suppressing evidence based on improper identification procedures by the NYPD, prior to 1997, are attached as Exhibit C, and incorporated herein.

205.  A number of New York cases overturning convictions or suppressing evidence based on Brady violations by the NYPD, prior to 1997, are attached as Exhibit D, and incorporated herein.

206.  Policymaking officials were also on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to "close" cases and to obtain arrests and

convictions.

207.    Policymaking officials were further on notice based on numerous credible allegations that NYPD officers had withheld and/or manufactured false or unreliable identification evidence, witness statements, or other evidence, and/or knowingly given false or misleading testimony, in violation of the constitutional obligations identified above.

208.    In fact, on July 7, 1994—a little over a year before Plaintiff's arrest—a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Report") had noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets."  The Mollen Report referred to police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful."[11]

209.    The Commission noted that "the Department's top commanders must share the blame" for the pervasive tolerance of police perjury and falsification.  Yet, the Commission reported, "[w]e are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch. Nor do we know of a single,

---

[11] Commission Report of the The City of New York Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, July 7, 1994 ("Mollen Commission Report") (available at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf).

self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification." (*Id.* at 41). "Changing attitudes about police falsification depends largely on the Department." (*Id.* at 42).

210.    The Mollen Commission "found a police culture that often tolerates and protects corruption. We also found that the Department completely abandoned it responsibility to transform that culture into one that drives out corruption ... (*Id.* at 107).

211.    The pervasive pattern of corruption that the Mollen Commision reported in 1994 – including perjury, "testilying," and falsification of police reports and documents – has continued virtually unabated since that time.  Moreover, this pattern of falsification and perjury has led to numerous wrongful convictions, as occurred in the instant case.

212.    This widespread disregard for the truth caused the wrongful conviction of GARRY, and countless others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

a.  Compensatory damages in an amount to be determined;

b.  Punitive damages against the Individual Defendants in an amount to be determined;

c.  Pre-judgment interest as allowed by law;

d.  An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court; and

e.  Such other further relief as the Court may deem just and proper.

Dated: May 5, 2019
   New York, New York

        GLENN A. GARBER, P.C.

        By: _____/s/_____
          Glenn A. Garber

        The Woolworth Building
        233 Broadway, Suite 2370
        New York, New York 10279
        (212) 965-9370

        RICKNER PLLC

        By: _____/s/_____
          Rob Rickner

        The Woolworth Building
        233 Broadway, Suite 2220
        New York, New York 10279
        (212) 300-6506

        *Attorneys for Edward Garry*

**Exhibit A**

*Bronx District Attorney's Office Brady and Related Violations*

*1.* *People v. Velez*, 118 A.D.2d 116 (1986): Prosecutor committed *Brady* violation by failing to disclose that the prosecution's key witness had "overriding animosity" against defendant and was motivated by vengeance related to prior incident.

*2.* *People v. Castro,* 147 A.D.2d 410 (1st Dept. 1989): Remand for hearing on § 440.10 motion ordered where co-defendant, unbeknownst to defendant at trial, provided information to prosecution.

*3.* *People v. Okafor,* N.Y.L.J. 9/8/1989 at p. 21: *Rosario* and *Brady* violations found and conviction reversed where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case.

4. *People v. Olmo,* 153 A.D.2d 544 (1st Dept. 1989): Remand for *Wade* hearing ordered after discovery that key witness gave perjured testimony that the prosecutor likely was aware of.

*5.* *People v. Negron,* 161 A.D.2d 537 (1st Dept. 1990): Conviction reversed where, among other things, prosecutor delivered a misleading summation accusing defendant and his counsel of fabricating theory of defense.

*6.* *People v. Butler,* 185 A.D.2d 141 (1st Dept. 1992): Conviction reversed where prosecutor's summation was found to violate the Code of Professional Responsibility.

*7.* *People v. Lewis,* 174 A.D.2d 294 (1st Dept. 1992): Conviction reversed where prosecutor failed to disclose deal made with different prosecutor in another city; misled the jury that no promises were made to key witness.

*8.* *People* v. *Banfield,* 194 A.D.2d 330 (1st Dept. 1993), and *People* v. *Byfield,* 194 A.D.2d 331 (1st Dept. 1993): Convictions reversed where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants.

*9.* *People* v. *White,* 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD5's of eyewitnesses prior statement, which contradicted eyewitness's trial

testimony, were withheld by prosecutor. The Court found that the People violated both *Brady* and *Rosario.*

10.    *People* v. *Ramos,* 201 A.D.2d 78 (1st Dept. 1994): Conviction reversed for prosecution's failure to turn over *Brady* material related to credibility of complaining witness in child abuse case.

11.    *People v. Rutter,* 202 A.D.2d 123 (1st Dept. 1994), and *People v. Bowen,* 234 A.D.2d 161 (1st Dept. 1996): Convictions reversed because, among other things, the prosecutor failed to disclose a transcript of a polygraph exam performed on the People's main witness containing both exculpatory and impeachment  material.

12.    *People v. Jackson*, 168 Misc. 2d 182 (Sup. Ct. 1995): District Attorney's Office, in violation of *Brady,* failed to disclose for three years statements by learning-disabled witness, who, by time of disclosure, was unable to recall many substantive details of events at issue.

13.    *People* v. *Lantigua,* 228 A.D.2d 213 (1st Dept. 1996): Conviction reversed where prosecutor failed to disclose that eyewitness was with another person when she allegedly saw the crime.

14.    *People v. Collins,* 173 Misc.2d 350 (Sup. Ct. Bronx Co. 1997): Conviction set aside for prosecutor's failure to disclose complainant's history of mental illness and substance abuse.

15.    *People* v. *King,* 241 A.D.2d 329 (1st Dept. 1997): Conviction reversed where prosecutor delayed turning over *Rosario*  material until just prior to summations.

16.    *People v. Mikel,* 710 N.Y.S.2d 70 (1st Dept. 1997): Conviction reversed where prosecutor failed to disclose that witness violated his cooperation agreement prior to trial by fleeing to Puerto Rico, and when he was returned, entered into a new cooperation agreement to cover the numerous felony charges stemming from his flight.

17.    *People v. Ortega,* 241 A.D.2d 369 (1st Dept. 1997):  Conviction reversed where, among other things, prosecutor failed to disclose the transcript of eyewitness's Grand Jury rebuttal testimony until its existence was discovered mid-trial.

44

*18.    Morales v. Portuondo,* 165 F. Supp. 2d 601 (S.D.N.Y. 2001): Convictions of two defendants unconditionally discharged based on prosecutor's failure to disclose key exculpatory evidence pointing to another perpetrator.

*19.    Mendez v. Artuz,* 303 F.3d 411 (2d Cir. 2002): District Attorney's suppression of favorable, material evidence, that third party in custody in another jurisdiction had confessed to hiring hit man to kill victim, was a *Brady* violation that required grant of writ of habeas corpus.

*20.    Flores v. Demskie,* 215 F.3d 293 (2d Cir. 2002): On the last day of trial prosecution disclosed that an additional memo book from one of the police witnesses had not been turned over and was lost.

*21.    People v. Johnson,* 191 Misc.2d 105 (Sup. Ct. Bronx Co. 2002): Conviction set aside for *Brady* and *Rosario* violations.

*22.    People v. Bruno,* Ind. No. 0027/97, N.Y.L.J., 4/23/03 at p. 19: Conviction reversed where prosecutor withheld information casting doubt on the voluntariness of a confession.

*23.    People v. Woods,* 9 A.D.2d 293 (1ˢᵗ Dept. 2004): Conviction reversed for *Crawford* errors at trial and also because prosecutor met with key witness alone in her office, and that witness could have viewed confidential records related to the trial.

*24.    People v. Garcia*, 46 A.D.3d 461 (2007): Prosecution failed to disclose exculpatory statements in it's possession which directly contradicted complainant's claim.

*25.    People v. Waters*, 35 Misc. 3d 855, 941 (Sup. Ct. 2012): Prosecutor failed to disclose the fact that the People's chief witness had changed his story and would testify at trial that he saw defendant stab the victim—instead of that he heard a thump, went into the next room, saw the bleeding victim and saw defendant fleeing the scene.  "While pretrial depositions are not normally available in criminal proceedings, given the conflicting accounts previously given by Mr. Baker under oath, and the egregious conduct of the prosecutor in suppressing this information, it is appropriate under these particular circumstances to ascertain exactly what this witness will testify to at trial." *Id.*

*26.    People v. Jimenez*, 142 A.D.3d 149, 164 (N.Y. App. Div. 2016): Remand for

hearing to determine whether prosecution violated *Brady* by failing to disclose terms of a cooperation agreement.

**Exhibit B**

*Secondary Sources Documenting Bronx District Attorney's Office Brady Violations*

1.  Radley Balko, *Misbehaving Bronx Prosecutors rarely sanctioned*, Washington Post, June 6, 2014 (available at https://www.washingtonpost.com/news/the-watch/wp/2014/06/16/add-it-to-the-pile-misbehaving-bronx-prosecutors-rarely-sanctioned/?noredirect=on&utm_term=.a44708193ccc) ("[A] man spent eight months at Rikers Island while awaiting trial on rape charges that were ultimately dismissed after prosecutors revealed they sat on information from the alleged victim that she had been paid to have sex with the accused.").

2.  Beth Schwartzapfel, *New York Courts Say: Hand It Over*, The Marshall Project, Nov. 8, 2017 (available at https://www.themarshallproject.org/2017/11/08/new-york-courts-say-hand-it-over) ("Steven Odiase . . . was convicted of killing a teenage boy in the Bronx in 2009. He was exonerated this year after defense attorneys discovered prosecutors had withheld key witness statements that could have helped prove Odiase's innocence.").

3.  Task Force on Criminal Discovery, New York State Bar Association, January 30, 2015 (available at http://www.nysba.org/workarea/DownloadAsset.aspx?id=54572) ("As far back as 1990, a Bronx study by the Victim Service Agency, based on complaint room interviews with 226 victims of a broad range of crimes, found that between 36% and 41% had been threatened and that those victims were three times more likely to decide to drop charges. Robert Davis, Barbara Smith and Madeline Henley, *Victim Witness Intimidation in Bronx Courts*, Victims Service Agency (New York, June 1990).

4.  Ellen Yaroshefsky, Wrongful Convictions: It Is Time to Take Prosecution Discipline Seriously, 8 U. D.C. L. Rev. 275, 281–82 (2004) ("When [the lack of discipline or oversight related to Brady violations from 1975-1996] was reported in the press, 'officials in the Bronx district attorney's office said that the citings were not conclusive evidence that the misconduct occurred willfully, or that a pattern existed, given the high volume of felony cases tried in the 21 year period . . . .' This comment reflects a failure of the district attorney's office to take responsibility for prosecutorial practices that lead to wrongful convictions. The Ramos case is a glaring example that internal controls to which disciplinary committees defer are ineffective.").

5.

6.  Andrea Elliott, *Prosecutors Not Penalized, Lawyer Says*, N.Y. Times, Dec. 17, 2003 (available at https://www.nytimes.com/2003/12/17/nyregion/prosecutors-not-penalized-lawyer-says.html ("In one such case, a [Bronx] prosecutor who was hired in 1978 and retired in 1984 was cited for prosecutorial misconduct in the appellate decisions of five criminal cases. He was singled out in a manslaughter reversal in 1985 for 'confusing and misleading the jury.' In that ruling, the judge recalled the prosecutor's cited misconduct in another manslaughter case that had been reversed and concluded that his conduct and

actions 'can only be viewed as willful and deliberate.' But according to his personnel records, his salary continued to rise steadily until he retired, and included merit raises and bonuses.").

7. Andrea Elliott, *When Prosecutors Err, Others Pay the Price; Disciplinary Action is Rare After Misconduct or Mistakes*, N.Y. Times, March 21, 2004 (available at https://www.nytimes.com/2004/03/21/nyregion/when-prosecutors-err-others-pay-price-disciplinary-action-rare-after-misconduct.html) ("The Lantigua case is one of a handful of Bronx cases in the last 15 years in which serious misconduct or error by prosecutors has led to wrongful convictions and people sent to prison. District Attorney Robert T. Johnson and his aides say that none of their prosecutors have engaged in deliberate misconduct, and that the reversals -- which they say are often made on minor, technical points -- represent less than 1 percent of the hundreds of felony convictions won by the office each year. Yet in all but one of the handful of cases, in which the misconduct and mistakes ranged from inappropriate closing arguments to the failure to disclose critical evidence, prosecutors escaped discipline. They were neither punished by their superiors nor publicly sanctioned by the State Supreme Court committee that investigates wrongdoing by lawyers. Many continued to receive merit raises and rise through the ranks.").

**Exhibit C**

*Cases Documenting Prejudicial or Improper Identification Procedures by the NYPD*

1.  *People v. Moss,* 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

2.  *People v. Nikollaj,* 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

3.  *People v. Clausell,* 182 A.D.2d 132 (2d Dept..1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.  *People v. Johnson,* 81 N.Y.2d 828 (1993): Conviction reversed where court found improper the show-up identification of defendant by robbery victim conducted hours after the crime, where both the defendant and the complainant were transported to the crime scene.

5.  *People v. Rojas,* 213 A.D.2d 56 (1st Dept. 1994): Conviction reversed where identification procedure was improper and prejudicial.

6.  *People v. Brogdon,* 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

7.  *People v. White,* 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo book.

**Exhibit D**

*Cases Documenting Brady Violations by the NYPD*

1.  *People v. Cortez,* 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve. The court found that the D.A.'s office shared responsibility and the indictment was dismissed.

2.  *People v. Moss,* 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

3.  *People v. Clausell,* 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.  *People v. Dunn,* 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

5.  *People v. Morrow,* 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

6.  *People v. White,* 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office.

7.  *People v. Anderson,* 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care."

8.  *People v. Brogdon,* 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

9.  *People v. Joseph,* 86 N.Y.2d 565 (1995): Adverse inference instruction appropriate where police deliberately destroyed interview notes.

10. *People v. White,* 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a

serious identification issue, and defendant was prejudiced by his inability to
cross-examine