UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------
EDWARD GARRY,

<table>
<tr><td></td><td><em>Plaintiff</em>,</td><td><strong>FIRST AMENDED</strong></td></tr>
<tr><td></td><td></td><td><strong>COMPLAINT AND</strong></td></tr>
<tr><td>- against -</td><td></td><td><strong>JURY DEMAND</strong></td></tr>
</table>

**Dkt. No. 1:19-cv-04010 (NRB)**

THE CITY OF NEW YORK, and
DETECTIVE GEORGE
MILIAN, sued in his individual capacity,

*Defendants*.
-------------------------------------------------------------------------

   Plaintiff EDWARD GARRY, by his attorneys Glenn A. Garber, PC, and Rickner PLLC,

hereby alleges as follows:

## NATURE OF ACTION

   1.  This is an action to recover money damages for the violation of GARRY'S rights

under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as

well as supplemental claims under the laws of the State of New York.

   2.  Despite his innocence, EDWARD GARRY ("GARRY" or "Plaintiff") was

wrongfully convicted and served nearly 22 years in prison for the August 18, 1995 Bronx murder

of retired New York City Police Department ("NYPD") Detective ("Det.") Oswald Potter.

   3.  The wrongful conviction and ensuing damages were caused by the intentional and

malicious misconduct of Defendant GEORGE MILIAN ("MILIAN"), a NYPD detective who was

in charge of the Potter murder investigation and responsible for the arrest and the initiation of

criminal proceedings against GARRY, and the NYPD; and caused by Angelo MacDonald, the

Assistant District Attorney ("ADA") in the Bronx County District Attorney's Office ("BCDAO")

handling GARRY'S prosecution, and the BCDAO.  It was also due to the fault of Defendant CITY OF NEW YORK, as policymaker, that enabled and fostered unethical cultures of closing cases and obtaining convictions at all costs at the expense of fair and honest investigations and prosecutions in the NYPD and the BCDAO; which included the failure to train, supervise and/or discipline police and prosecutors in the NYPD and the BCDAO about their obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny ("*Brady"* and *"Brady* violations").

4.      The Claims sound in malicious prosecution, and denials of the right to a fair trial.

5.      Liability against the Defendant CITY OF NEW YORK is invoked under the doctrine of *respondeat superior* for the misconduct of MILIAN, and the CITY OF NEW YORK is liable under *Monell v. Department of Social Services of the City New York,* 436 U.S. 658 (1978), as its *de facto* policies and procedures were the driving force behind the constitutional violations that caused GARRY'S wrongful imprisonment.

**JURISDICTION AND VENUE**

6.      This Court has original subject matter jurisdiction over GARRY'S federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because GARRY'S claims arise under laws of the United States, namely 42 U.S.C. §§ 1983 and 1988, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution, namely the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

7.      This Court has supplemental jurisdiction over GARRY'S state law claims pursuant to 28 U.S.C. § 1367(a) as they are part of the same case or controversy giving rise to the federal claims and share the same nucleus of operative facts as the federal claims.

8.      Venue is lodged in the United States District Court for the Southern District of New

York pursuant to 28 U.S.C. §§ 1391(a)-(c) and 1402(b) because substantial parts of the events or omissions giving rise to the claim occurred in the Bronx which is located in the Southern District of New York.

## CONDITION PRECEDENT TO SUPPLEMENTAL STATE CLAIMS

9.      GARRY complied with all conditions precedent to the commencement of the supplemental state claims.

10.     On or about April 27, 2018, GARRY timely served a notice of claim upon the Defendant CITY OF NEW YORK pursuant to Section 50-i of the New York General Municipal Law.

11.     More than 30 days has elapsed since GARRY served the notice of claim and no payment or adjustment or offer of settlement has been made.

12.     GARRY submitted to a hearing pursuant to Section 50-h of the New York General Municipal Law on August 16, 2018.

13.     GARRY brings this action in a timely manner.

## JURY DEMAND

14.     GARRY demands trial by jury in this action.

## PARTIES, EMPLOYEES, and POLICYMAKERS

15.     GARRY was wrongfully prosecuted, indicted, tried, convicted, and imprisoned by the unlawful and illegal actions of the Defendants.

16.     Defendant CITY OF NEW YORK is and was at all times relevant herein a municipal corporation existing under and by virtue of the laws of the State of New York, and having the powers and duties imposed by law thereon, and is situated in the Southern District of New York.

17.     The NYPD and the BCDOA are and were at all times relevant herein agencies of the Defendant CITY OF NEW YORK and the Defendant CITY OF NEW YORK was a policymaker for these agencies.

18.     At all times relevant to this action, defendant CITY OF NEW YORK, by its agents, servants, and employees was responsible for the operation, maintenance, and control of NYPD and the BCDAO, and the selection, training, supervision, and disciplining of police officers and prosecutors.

19.     At all relevant times, the Police Commissioner was an officer in charge of the NYPD, an agency funded out of the CITY OF NEW YORK'S budget.

20.     The Police Commissioner and his authorized delegates at all relevant times had final authority, and constituted a policymaker for the CITY OF NEW YORK and whom the City is liable, with respect to the hiring, management, training, supervision and discipline of personnel employed by or assigned to the NYPD.

21.     Robert Johnson, at all relevant times, was the Bronx County District Attorney an elected officer of Bronx County in charge of the BCDAO, an agency funded out of the CITY OF NEW YORK'S budget.

22.     Robert Johnson and his authorized delegates at all relevant times had final authority, and constituted a policymaker for the CITY OF NEW YORK and for whom the City is liable, with respect to the hiring, management, training, supervision and discipline of personnel employed by or assigned to the BCDAO.

23.     Robert Johnson was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

24.     The State of New York has provided by statute that Defendant CITY OF NEW

YORK'S constituent counties (including Bronx County), and hence Defendant CITY itself, is liable for torts committed by County officers and employees, such as the District of Attorney of the Bronx County, Robert Johnson, and his ADAs, including Angelo MacDonald.  See N.Y. County Law §§ 53, 941.

25.     Defendant Detective GEORGE MILIAN is and was at all relevant times herein a duly appointed agent, employee, officer, and servant of the NYPD.

26.     Defendant MILIAN is being sued in his individual capacity.

27.     ADA Angelo MacDonald is and was at all relevant times herein a duly appointed agent, employee, officer, and servant of the BCDAO.

28.     At all relevant times herein, Defendant MILIAN acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and CITY OF NEW YORK, and on behalf of and within the scope of his employment, duties and functions as an agent, employee, officer, and servant of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of his lawful functions and duties.

29.     At all relevant times herein, ADA MacDonald acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and CITY OF NEW YORK, and on behalf of and within the scope of his employment, duties and functions as an agent, employee, officer, and servant of the BCDAO, and otherwise performed and engaged in conduct incidental to the performance of his lawful functions and duties.

30.     Defendant MILIAN is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS

### Procedural History

31.     On November 19, 1997, GARRY was wrongfully convicted after a jury trial of murder in the second degree and two counts of robbery in the second degree.

32.     The judgment of conviction was rendered after a jury trial under indictment number 6083-1995 in the Supreme Court of the State of New York, Bronx County.

33.     On December 17, 1997, GARRY was sentenced to twenty-five years to life in prison.

34.     On February 3, 2000, the Appellate Division, First Department, affirmed the conviction and upheld the sentence. *People v. Garry,* 269 A.D.2d 158 (1st Dept. 2000).   Leave to appeal in the Court of Appeals was denied on April 14, 2000.  *People v. Garry,* 94 N.Y.2d 947 (2000).

35.     In 2002, GARRY brought an unsuccessful motion to vacate his conviction pursuant to C.P.L. § 440.10 based upon the recantation of a jailhouse informant who testified against him at trial.

36.     A petition for a writ of habeas corpus, brought by GARRY in the Southern District of New York, was denied on June 19, 2003. *Garry v. Grenier,* 2003 WL 21436217 (SDNY, 2003).

37.     In 2009, GARRY brought another unsuccessful motion to vacate his conviction pursuant to C.P.L. § 440.10 based upon the failure of two accomplices in the Potter murder to implicate him as a participant in the crime.

38.     Then in 2014, GARRY successfully moved pursuant to C.P.L. § 440.10 to vacate his conviction based upon a *Brady* violation, which included the pretrial suppression of a

confession by the real killer, among other things.

39.     After an evidentiary hearing on the motion, the conviction was vacated and a new trial was granted by Decision and Order dated March 22, 2017.

40.     On March 31, 2017, GARRY was released on bail pending retrial.

41.     On February 5, 2018, the indictment was dismissed against GARRY when the jury, at retrial, acquitted him of all charges.

**The Crime**

42.     On August 18, 1995, retired NYPD Det. Oswald Potter was shot and killed during a robbery of a Bronx gambling parlor located in the back room of the New Hope Grocery at 3581 Laconia Avenue.  He was killed after engaging in a struggle and exchanging gunfire with two armed perpetrators who entered the location.

43.     Witnesses described the perpetrators as a light-skinned male Hispanic and a dark skinned male or male black.  According to Gladys Garcia, the clerk behind the counter at the gambling parlor, the Hispanic male announced a stick up, fired shots into the ceiling, and instructed her to fill a plastic bag with money.

44.     Potter grabbed the male black perpetrator.  A struggle ensued and Potter knocked the male black to the floor.  The Hispanic perpetrator then chased Potter into the front of the store and shot Potter in the chest.

45.     According to Garcia, the male black perpetrator retrieved the bag from her which contained approximately $500 or $600 in cash.  The two men then fled the store as Potter, although wounded, pursued and shot at them.

46.     Potter was rushed to the hospital and died from a gunshot wound.

## The Weak Identifications that were Improperly Inflated
## by Multiple Viewings of GARRY'S image

47.     MILIAN of the 47th Precinct in Bronx was assigned to investigate the Potter murder. MILIAN was assisted by Det. Peter Forcelli.[1]

48.     The police investigation culminated in two objectively unreliable eyewitness identifications of GARRY as being the light-skinned Hispanic male shooter – one from Gladys Garcia, who was inside of the gambling parlor, and the other from Antonio Vargas, Jr., who was outside in a truck.

49.     Both Garcia and Vargas had fleeting opportunities to see the light-skinned male Hispanic perpetrator, and under compromised circumstances.

50.     For Garcia, the event was very stressful, an armed robbery; the light-skinned Hispanic shooter immediately brandished a firearm and discharged shots into the ceiling before the incident devolved into an altercation between the male black perpetrator, which drew her attention away from the light-skinned male Hispanic.  Moreover, the light-skinned male Hispanic perpetrator was wearing a hat.

51.     Antonio Vargas, Jr., the other eyewitness, was sitting in a delivery truck elevated above the ground, reading a newspaper, while his father went into the bodega to make a delivery. The perpetrators approached in their car and parked in front of him.  Two men exited their car and Vargas glanced up, noticing the light-skinned Hispanic male's clothing.  The men then turned toward the store with their backs to him, and he returned to reading his newspaper until he heard a gunshot from inside the store and exited the truck.

---

[1] Det. Forcelli is now head of national training for the federal Bureau of Alcohol, Tobacco and Firearms.  Special Agent Forcelli has come to believe that GARRY is innocent and was wrongfully convicted. He testified for GARRY in his defense during the 2014 post-conviction litigation and at his retrial.

52.     As his father ran out of the store, Vargas turned and ran back to the truck with his father, just as the two perpetrators were running from the store to the getaway car. Vargas did not get a good look at the men as they were running; shots had been fired, adding to the stress and causing him to frantically scurry to the truck to get away.  His best look was in the few seconds when the two individuals walked past his truck to enter the store before the crime and when he only saw the light-skinned Hispanic male from a side angle.

53.     While first viewing photographs at the 47th precinct on August 19, 1995, in a procedure conducted by MILIAN, Garcia was equivocal when she passed upon GARRY'S picture, merely stating "[t]his looks like the guy."

54.     Despite the fact that it was problematic and against protocol to then show Garcia GARRY'S photograph again, since doing so could falsely inflate the certainty of what was a questionable identification, MILIAN brought Garcia to the Catch Unit at the 48th Precinct to view GARRY'S photograph (*believed to be the same photograph*) a second time.

55.     As would be expected, based on her prior exposure to GARRY'S photograph, Garcia's level of certainty artificially increased the second time, and her certitude continued to inflate at the line-up, and then at trial when she made an in-court identification.

56.     Vargas was also equivocal when first viewing GARRY'S photograph.

57.     As Vargas described his initial viewing of photographs at the 47th Precinct with MILIAN on August 20, 1995, "I didn't want to make a –say that I was positive that the person I was pointing out was the person I thought I had seen. So I mentioned it lightly that this could be somebody who resembled the person I saw, but I didn't put too much emphasis in saying that this

is the person."[2]

58.     Two days later in the Catch Unit at the 48th Precinct, MILIAN (against protocol again) showed Vargas a smaller collection of photographs, which contained the same photograph of GARRY.[3]

**MILIAN Fails to Disclose that Vargas also Selected Photographs of Others and Inaccurately Reports the Quality of Vargas' and Garcia's Equivocal Identifications**

59.     While viewing photographs the second time at the Catch Unit, Vargas also picked out two or three other people as possibly being the light-skinned Hispanic male perpetrator.

60.     However, this exculpatory evidence was never recorded by MILIAN, who was responsible for doing so as the assigned detective and the detective who documented Vargas' photographic viewings at the Catch Unit.  It was also withheld from the prosecution and the defense.

61.     In addition, MILIAN failed to investigate the other potential suspects, or preserve the photographs.

62.     Had MILIAN preserved the photographs they could have been used by the prosecutor to fully assess the case, to refocus the investigation, including placing them in arrays and showing them to Garcia, or used by the defense at trial to undermine the identifications.

63.     In addition to failing to document and preserve Vargas' photographic picks of persons other than GARRY, MILIAN falsely reported in a police report ("DD5") that at the 47th Precinct Vargas "identified" GARRY as a "possible perpetrator," as opposed to accurately stating

---

[2] At the 47th Precinct viewing, MILIAN (also against protocol) permitted Vargas's father, Antonio Vargas, Sr., a potential eyewitness, to view photographs with his son.  The two were left alone at times and discussed the photographs they were looking at.

[3] Another risk factor for misidentification is "mugshot exposure" – multiple viewings of the same suspect – which can falsely elevate a witness's level of certainty of an identification.

that it "could be someone who resembled the person."

64.     MILIAN also misreported that Vargas positively identified GARRY during a subsequent line-up when he in reality he continued to be equivocal.

65.     Furthermore, MILIAN misrepresented to ADA MacDonald and others at the BCDAO the quality of Garcia's initial identification.  Although Garcia was equivocal, merely stating that GARRY "looked like" a perpetrator, MILIAN falsely stated that Garcia's reaction when she saw GARRY'S photograph was indicative of a strong identification despite her words.

66.     Based on the weak and suspect identifications by Garcia and Vargas GARRY was arrested on August 22, 1995, and indicted and prosecuted for the Potter murder. MILIAN lacked probable cause, and yet pressed for a prosecution and indictment.

67.     GARRY was prosecuted without prosecutors from the BCDAO ever knowing that Vargas picked people other than GARRY as the light-skinned Hispanic male perpetrator, that Vargas' line-up identification was equivocal, and GARICA was in fact equivocal when first viewing GARRY'S photograph.

68.     Prosecutors relied upon his inaccurate information when deciding to prosecute and indict GARRY.

69.     Then at trial, ADA MacDonald exploited this false information supplied by MILIAN by eliciting from him false testimony that Vargas only selected one photograph during photo viewings and that it was of GARRY, and that Garcia's equivocation during her first identification procedure was misleading and that she really made a solid identification.

70.     Moreover, on summation, and to counter arguments made by the defense, ADA MacDonald, again using the false evidence provided by MILIAN, falsely argued that Vargas' and Garcia's identifications were of a much higher quality than they actually were.

71.     Although the investigation continued for a short time thereafter while attempts were made to identify the male black perpetrator, the case was largely considered closed by GARRY'S arrest, and a task force assembled to work on the case was disbanded.

72.     The NYPD never made any arrests other than of GARRY for this crime.

**Prior to Trial Someone Else Confesses to Shooting Potter,
and ADA MacDonald Withholds this Evidence from GARRY**

73.     In early 1996, Det. Forcelli was transferred from the 47th precinct to the 45th precinct. There, he began investigating the homicide of Keith Ralph, who was disemboweled in a Coop City stairwell on August 9, 1995, nine days before the Oswald Potter murder.

74.     Stephen Frances Martinez was believed to have murdered Ralph. Forcelli and his partner from the 45th Precinct, Det. Joe Russell, met on numerous occasions with an informant named Derek Nicholson to develop information about Martinez.

75.     At one such meeting, which occurred in Forcelli and Russell's police cruiser, the informant told them that Martinez had admitted his involvement in a robbery which occurred in a bodega in an area of the 47th precinct covering the site of the Potter murder, where somebody was shot and possibly killed.  Det. Forcelli immediately recognized those facts to be consistent with the Potter murder which he had also investigated.

76.     To sure up his belief, Forcelli utilized the NYPD's Computer Assisted Robbery Search System ("CARS"), which contained information on all robberies reported within the five boroughs.  Forcelli entered parameters related to the information he learned ("robbery," "shots fired," "injury or death," and "grocery store") and specified the location as the 47th precinct, and a two-year time period from 1994 to 1996 (straddling the date of the Potter homicide – August 18, 1995).  The only crime matching that description in CARS was the Oswald Potter murder.

77.     Det. Forcelli later sought additional information from Nicholson regarding

Martinez's admissions.  A June 12, 1996 DD5 drafted by Forcelli documented his conversation with the information that same day.  It stated that the informant told Forcelli:

> While in Marilyn's house last summer [the summer of 1995], Steve Martinez came into the apartment sweating and apparently 'flustered' stating "I just shot some guy on Laconia Avenue."  [The avenue where the Potter murder occurred].  Martinez then brandished a Ruger 9mm (per the subject's knowledge of guns) as if to show off the weapon he used.

78.     Forcelli considered Martinez's statement to be a "confession" to the Potter homicide.  He included in the DD5 the informant's description of Martinez's demeanor as sweating and "flustered" when he made the statement because to Forcelli it was an indication of reliability.  Forcelli then followed up by speaking with Marilyn, who confirmed that Martinez had confessed as reported by the Nicholson.

79.     Taking action on the information, Det. Forcelli also requested that the NYPD's latent print unit compare Martinez's prints to those lifted in the Potter homicide, and notified detectives at the 47th precinct that Martinez was a suspect.

80.     Finally, Det. Forcelli informed ADA MacDonald, who was assigned to both the Ralph and Potter homicides, of the evidence he obtained implicating Martinez in the Potter murder.  Forcelli testified that he had "lengthy" and "hearty" discussions with ADA MacDonald when they met twice in June of 1996 and that they discussed the Potter homicide and the evidence linking Martinez to it in "excessive depth."

81.     Notably, these meetings occurred after GARRY'S arrest and prior to his trial.

82.     ADA MacDonald also took notes which indicate that he too acted on the information Det. Forcelli provided about Martinez.  ADA MacDonald or someone else in law enforcement obtained Martinez's mugshot and sent it to a detective at the 47th precinct for a possible photo array to be shown to witnesses on the Potter case.

83.     ADA MacDonald would later testify at a post-conviction hearing that he did not know if Martinez's photograph was ever shown to witnesses, or if any follow-up work was done with the Martinez evidence.

84.     Martinez not only confessed to being the shooter, he is also a light-skinned Hispanic male and meets the description of the shooter. Given that GARRY was also a light-skinned Hispanic male and his role in the offense was that of the shooter, it was apparent to ADA MacDonald, who was the trial assistant prosecuting GARRY that Martinez was an alternate perpetrator.

85.     Nevertheless, and even though ADA MacDonald received the exculpatory Martinez evidence from Det. Forcelli prior to GARRY'S trial, the evidence was never provided to GARRY or his counsel. Consequently, this exculpatory information could not be further investigated or used by the defense at trial to develop and/or advance a third-party culpability defense.

86.     No one other than GARRY was ever prosecuted by the BCDAO for the Potter murder.

**The Prosecution's Use of a Known Unreliable Jailhouse Informant, and the Failure to Disclose Evidence about his Lack of Credibility**

87.     GARRY was tried in October and November, 1997.

88.     Because the prosecution's cases relied *only* on the questionable identifications of Garcia and Vargas, ADA MacDonald was desperate.[4]

89.     To get an unfair leg up, ADA MacDonald decided to use Lorel Huffman as a trial witness. Huffman was a notorious unreliable career jailhouse informant, who claimed without any corroboration, that Garry confessed to him while they sat together in the court pen at the Bronx

---

[4] Garcia made an in-court identification and Vargas' line-up identification came in against GARRY at trial.

Criminal Courthouse.

90.     Huffman became a "go to" informant for prosecutors in the BCDAO and in other prosecutors' offices before and after GARRY'S trial, and was shuffled around New York City jails. Huffman also derived substantial financial benefits and sentence reductions by testifying for prosecutors in numerous cases.

91.     At GARRY'S trial, Huffman claimed that GARRY'S was one of many spontaneous murder confessions supposedly made to him within a single four-month period.

92.     ADA MacDonald was also aware of information directly related to Huffman's lack of credibility that he failed to disclose to the defense for impeachment purposes, including his history of falsely reporting crimes as a cooperator in other cases and mental health problems that impacted his credibility.  And, ADA MacDonald knew or should have known that Huffman was not credible, and that his testimony would be perjurious.

93.     Nevertheless, ADA MacDonald had Huffman testify and presented Huffman to the jury as if he was credible, and MacDonald argued that he was credible to the jury in his summation, without giving GARRY a fair and effective way to challenge these assertions.

94.     After GARRY'S conviction Huffman recanted his trial testimony a number of times.

95.     In a series of letters in 2001 and 2002 to the BCDAO and the Court, Huffman revealed that prosecutors, including ADA MacDonald, were aware his long history of fabricating information against criminal defendants and falsely testifying against them, and of his past history of mental illness.

96.     Huffman also explained that this exculpatory evidence as well as notes he took that enabled him to falsify testimony against GARRY, among other things, was withheld from the

defense by the BCDAO.

97.    In 2002, GARRY brought a 440 motion based on Huffman's recantation and was granted a hearing, but the motion was later dismissed after Huffman's attorney informed the court that his client would invoke his Fifth Amendment against self-incrimination.[5]

**The Investigation by the United States Attorney's Office and the 2008 440 Motion**

98.    Years later, a federal investigation by the United States Attorney's Office for the Southern District of New York ("USAO") revealed that the gambling parlor robbery and Potter murder was perpetrated by four men.

99.    The male black perpetrator, Lawrence Broussard, was arrested in 2004 for gun possession and cooperated with the USAO. He informed that three other individuals were responsible for the Potter murder:  Jose Marrero ("Pito"), the getaway driver, Brent Mason, who helped plan the robbery, and a light-skinned Hispanic male he knew as "Flip," the shooter.  Mason also cooperated and identified Broussard and Marrero as co-perpetrators in the Potter murder. Broussard and Mason were shown photo arrays containing GARRY's photograph, but neither identified GARRY as being a participant in the crime.[6]

100.    Mason's and Broussard's negative identifications were the basis of a 440 motion filed in 2008 which led to an evidentiary hearing.  But neither Broussard nor Mason had yet been sentenced in federal court and were declared unavailable for the hearing.

101.    In the opinion denying the motion, the court acknowledged "that the negative identifications tend to exonerate the defendant" and it was "certainly *possible* that a jury presented

---

[5] Due to Huffman's lack of credibility, the prosecution agreed by stipulation not to rely on him in the 2014 440 proceeding that led to the new trial.

[6] Marrero refused to cooperate with the USAO, but pled guilty in 2010 to a firearm charge related to the Potter homicide.

with the negative identifications could return a verdict of not guilty." However, it found that the negative identifications did not, in and of themselves, create a *probability* of a more favorable outcome for GARRY, the standard for relief for a newly discovered evidence claim in New York state court.

### The 440 Motion and Hearing that Led to Vacatur of the Conviction and Retrial

102.    GARRY contacted The Exoneration Initiative ("EXI") in 2010 to reinvestigate his case.[7]  As part of the reinvestigation, EXI submitted a FOIL request to the NYPD for police records.  In response, the NYPD disclosed a fingerprint report which indicated that on June 18, 1996, the NYPD's latent print unit compared fingerprints found at the crime scene to those of Stephen Martinez.  Although the results of the comparison were negative (as were the results of comparison to GARRY's fingerprints), the report was an indicator – the *first* in almost 20 years of litigation on GARRY's case – that police had reason to suspect Martinez as a perpetrator for the Potter murder.

103.    The USAO also reopened its own reinvestigation of the Potter murder.

104.    Working together, EXI provided the fingerprint report to John O'Malley, an investigator at the USAO.[8]  O'Malley obtained copies of Martinez's Rap Sheet and arrest photographs and confirmed that Martinez met the trial eyewitnesses' descriptions of the light-skinned Hispanic male perpetrator who they had identified as GARRY. O'Malley also generated a photographic array with Martinez as the target.

---

[7] EXI is an organization that evaluates and litigates non-DNA innocence claims on behalf of indigent New York state prisoners.

[8] Martinez's name was redacted from the fingerprint report EXI obtained under FOIL, and only his New York State Identification Number ("NYSID number") was visible.  Using that number, EXI was able to ascertain his name, which was later confirmed by O'Malley's investigation.

105.    On April 15, 2014, O'Malley flew to the state where Broussard resided, met him in the airport, and showed him the array. Pointing at the photograph of Steven Chapman (a/k/a "Stephen Martinez"), Broussard immediately stated "that's Flip," the light-skinned Hispanic male shooter.

106.    Following Broussard's identification of Martinez, GARRY filed another 440 motion on August 4, 2014.  A hearing was granted which commenced in Bronx Supreme Court on November 18, 2015.[9]

107.    Testimony was offered at the hearing by Special Agent Peter Forcelli, Lawrence Broussard, former Assistant United States Attorney Avi Weitzman, John O'Malley, former ADA MacDonald, Jose Marrero, Garry's original trial attorney Lawrence Sheehan, and Mark Uner, a custodian of records from the Minnesota prison where Martinez was located during the 440 litigation.

108.    Broussard testified that he did not know Flip before the robbery and never knew Flip's real name in 1995 when they committed the Potter crime together.

109.    He was sure that Martinez, who he recognized and identified in the 2014 photo array shown to him by O'Malley, was Flip.

110.    Then, looking at GARRY in the courtroom, Broussard said for certain that GARRY was *not* Flip, and that GARRY was *not* the person who robbed the gambling parlor with him in 1995 and shot and killed Oswald Potter.

111.    Jose Marrero did not cooperate in the federal reinvestigation, and he refused to speak with the defense during the course of EXI's investigation.  However, he testified at the 440

---

[9] A partial hearing was held before Justice Richard Lee Price. However, due to Judge Price's medical condition, the case was transferred to Justice Michael Gross, who started the hearing anew.

hearing under court order and was granted transactional immunity from state prosecution for the Potter murder.

112.   Marrero testified that he drove the getaway car during the commission of the crime. He stated unequivocally that GARRY was not the fourth participant in the Potter homicide.  Indeed, Marrero was adamant that GARRY was too young to be the fourth perpetrator.

113.   Recordings of telephone calls between Stephen Martinez, who was incarcerated in Minnesota, and Stephanie Clifford, a reporter who was writing a story for the New Yorker about the case, were admitted into evidence.  In the recordings, Martinez provided a detailed *false alibi* claiming to have been living in California from January of 1995 through 1997.  However, it was undisputed and documented in Martinez's RAP sheet and in a police report that he was in fact living in the Bronx during the summer of 1995, when the Potter and Ralph homicides took place.

114.   GARRY's trial counsel Lawrence Sheehan testified and confirmed that he was never apprised of Martinez's culpability for the Potter murder by anyone, despite his specific pretrial requests for discovery which encompassed this information.  He stated that if he had received this information, he would have investigated it and moved to admit Martinez's confession into evidence at trial as an exculpatory declaration against penal interest in support of an alternate perpetrator defense.

115.   Special Agent Forcelli testified that based on his investigation of Martinez in 1996, and as one of the detectives who worked on the Potter homicide in 1995, GARRY was misidentified and is actually innocent of the crime.

116.   By Decision and Order dated March 22, 2017 Justice Michael Gross held that GARRY was entitled to a new trial because exculpatory material about the Martinez confession was withheld in violation of GARRY's right to due process of law.

117.    In finding a *Brady* violation, Justice Michael Gross, stated:

Since Martinez's statement may have implicated someone other than defendant in the murder of Oswald Potter, it constituted exculpatory evidence under the *Brady* doctrine *(see People* v. *Robinson,* 133 A.D.2d 859 [2d Dept. 1987] [witness's statement directly implicating three men other than defendants as perpetrators constituted important exculpatory information discoverable under *Brady*]).

***

Despite [some] differences, there were major similarities between Martinez's statement and the Potter murder. Martinez admitted to shooting a man in the same temporal and geographic proximity as the Potter murder. He also stated that the shooting occurred during the robbery of a grocery store – the exact facts in the Potter case. Moreover, Forcelli testified that aside from the Potter case, no other case fit this description within a two-year period. Additionally, Martinez matched the general description of Potter's shooter -- light-skinned male Hispanic with a goatee and large nose.

**The Retrial**

118.    Retrial commenced in late January 2018.

119.    The prosecution's case essentially rested on the testimony of Gladys Garcia and Antonio Vargas, Jr.  Det. MILIAN, who was retired, also testified for the prosecution.

120.    GARRY put on a defense and called a number of witnesses:  John O'Malley, Special Agent Forcelli, Avi Weitzman, Derek Nicholson and Jose Marrero.

121.    Throughout the new trial, the defense argued that GARRY was innocent.  It contended that he was not present when the crime occurred and that it was a case of mistaken identification; that NYPD and the BCDAO failed to investigate evidence of the true killer, Stephen Martinez, even though they had his confession to the Potter murder prior to Garry's initial trial; and that they covered up the exculpatory evidence and frustrated the USAO and EXI's ability to reinvestigate.

122.    On February 5, 2018, after only 30 minutes of deliberations the jury returned a verdict of not guilty, causing the indictment and all charges against GARRY to be dismissed and finally undoing the wrongful conviction.

20

**The CITY OF NEW YORK's (NYPD and BCDAO) Deliberate Indifference to *Brady* Violations and the Failure to Train, Supervise, and/or Discipline**

123.    At the time of GARRY'S arrest, the CITY OF NEW YORK acting through policymaking officials for both the NYPD and the BCDAO acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of officers and prosecutors to properly document and disclose *Brady* material.

124.    Supervisory personnel in both offices were aware of this widespread misconduct but took no adequate corrective or preventive measures. NYPD officers, trial prosecutors in the BCDAO'S office, and the supervisors and policymakers in the respective offices were deliberately indifferent to the abuses inflicted on criminal defendants whose convictions were regularly secured without regard to their constitutional rights or their guilt. Thus, police officers and prosecutors were left to operate with the sense that they could engage in these abuses without risking appropriate disciplinary consequences.  Correspondingly, *de facto* policies existed in the NYPD and the BCDAO during the time of GARRY'S arrest, prosecution and trial that made it acceptable and even encouraged police officers and prosecutors to commit *Brady* violations.

125.    GARRY'S wrongful conviction was not an isolated incident.  By 1996 when GARRY'S case went to trial, the NYPD and the BCDAO were well aware that arrests and prosecutions tainted by *Brady* violations were a major problem.  Indeed, a steady parade of wrongful and troubled convictions undermined by constitutional violations occurred in New York City and in the Bronx during the decade or so that led up to GARRY'S conviction.

126.    The investigation of the New York State Bar Association's Task Force on Wrongful Convictions released in 2009, which covered 53 cases, found that "government practices" –

21

referring to a range of errors and misconduct by police and prosecutors, including the failure of prosecutors to comply with *Brady* obligations and the "early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime" – contributed to more than 50% of the 53 New York wrongful convictions studied by the Task Force. *Final Report of the New York State Bar Association's Task Force on Wrongful Convictions*, April 4, 2009, "NYSBA Report," at 19.[10] In addition, the Task Force identified a much larger number of cases that "d[id] not reveal an actually innocent person being wrongfully convicted," but "nonetheless often reveal[ed]" a pattern of "troubling due process violations that may result in a defendant being denied a fair trial." *Id.*

127.   The Task Force found that one contributing factor to the pervasive and far-reaching problem of *Brady* evidence not being properly disclosed to the defense, as required by both the state and federal constitutions, was where police failed to make reports of "information that was viewed by the detective as not aiding the investigation." *Id.* at 44.  Yet the police, by deliberately suppressing and failing to document this sort of information, all but ensure that a fair trial will not occur, in violation of due process of law. The Task Force observed that "[p]rosecutors' access to evidence known to the police depends ultimately on the willingness of the police to record, preserve, and reveal such evidence." *Id.* at 37-38

128.   One of the recommendations by the Task Force as to police was the need for "Train[ing] and Supervis[ion] in the Application of *Brady* and Truthful Evidence Rules." *Id.* at 37.

---

[10] The 53 cases spanned from 1964 to 2004 and 38 of them (over 70%) were from 1985 to 1996, the eleven-year period preceding GARRY'S conviction.  NYSBA Report, Appendix B, at 186. Moreover, most of the cases were from New York City, and many were from the Bronx.

As to Prosecutor's Offices, the Task Force noted that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show such conduct still occurs." *Id.* at 26 (internal cites omitted). Consequently, to the extent not already in existence, it recommended that Prosecutor's Offices create procedures to evaluate and impose sanctions for prosecutorial misconduct. *Id.* at 29. It is believed that in the decade or so leading up to GARRY'S arrest and through his prosecution and trial, the BCDAO did not have such procedures in place.

129.    On July 7, 1994 – just a little over a year before GARRY'S arrest—a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Report") noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." Mollen Report at 36. The Mollen Report referred to police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful." *Id.* at 41.

130.    A study of exonerations in the United States from 1989 to 2012 found that the Bronx was one of the top counties that led the nation in exonerations. Samuel R. Gross, University of Michigan Law School, *Exonerations in the United States, 1989-2012, National Registry of Exonerations,* June, 2012.

131.    It was inherently obvious to the NYPD and the BCDAO that on and around the time of GARRY'S arrest, prosecution, and trial there was a need to train, supervise, and/or discipline police and ADAs to comply with their constitutional *Brady* obligations to counteract the

pressure that the NYPD and the BCDAO applied to police and prosecutors to obtain convictions.

132.   The NYPD and the BCDAO knew to a moral certainty that *Brady* issues regularly arise in the investigation and prosecution of criminal cases; that such issues present their employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult; that their employees facing such issues have strong incentives to make the wrong choices, especially given the pressure in the NYPD to close cases and in the BCDAO to win convictions at any cost; that the wrong choice by their employees concerning *Brady* issues will frequently cause the deprivation of the constitutional rights of the accused and cause them constitutional injury; and that their employees had a history of making wrong choices in such matters, specifically related to *Brady* obligations.

133.   In the years surrounding GARRY'S malicious prosecution and wrongful conviction, officers of the NYPD and members of the BCDAO routinely failed to turn over exculpatory evidence, including information that undermined the reliability of identifications, that someone else committed the crime, and that discredited witnesses.

134.   Public records demonstrate that in the decade or so leading up to GARRY'S arrest and conviction numerous criminal defendants were wrongfully convicted in the Bronx by means of similar unconstitutional practices of police officers and prosecutors.

135.   The National Registry of Exonerations, a database that tracks and analyzes wrongful convictions in the United States, found that 43 wrongful convictions in the Bronx involved "official misconduct,"[11] and that most of them occurred during the time period of

---

[11] Official misconduct is defined as "[p]olice, prosecutor, or other government officials significantly abus[ing] their authority or the judicial process in a manner that contributed to [an] exoneree's conviction[,]" and it primarily involves the withholding of *Brady* material by police and prosecutors.

GARRY'S case.  www.law.umich.edu/special/exoneration/Pages/about.aspx (last visited July 8, 2019). And of the 55 cases, 29 (more than 50%) were from 1985 to 1996.

136.    Numerous court decisions and documented exonerations provide a pattern of *Brady* violations and related misconduct committed by the NYPD and the BCDAO that is similar to that which occurred in this case and demonstrates that such violations were known to be regular practices in both the NYPD and the BCDAO from the mid-1980s to mid-1990s.  Attached hereto and incorporated herein are: 1) *Brady* and related violations by the NYPD (Exhibit, "Ex." A); and 2) *Brady* violations and related misconduct by the BCDAO (Ex. B).

137.    In addition to the failure to train and supervise, the failure to discipline police and prosecutors for their misconduct, including *Brady* violations, were other problems for the NYPD and BCDAO in the period leading up to and through GARRY'S arrest and conviction and it demonstrates a deliberate indifference, indeed the sanctioning of, such violations.

138.    Regarding the NYPD, the Mollen Commission noted that "the Department's top commanders must share the blame" for the pervasive tolerance of police perjury and falsification. Yet, the Commission reported, "[w]e are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch. Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification." Mollen Report, at 41. "Changing attitudes about police falsification depends largely on the Department." *Id.* at 42.

139.    The Mollen Commission further "found a police culture that often tolerates and protects corruption [and that] the Department completely abandoned its responsibility to transform that culture into one that drives out corruption ... *Id.* at 107.

140.    *Ramos v. City of New York*, 285 A.D.2d 284, 307 (2001), is an exemplar case that

shows deliberate indifference to, and acceptance of, *Brady* violations in the BCDAO during times relevant to the instant case through the failure to discipline prosecutors.  Ramos was convicted in 1985 of sexually abusing a child.  In 1992 (3 years before GARRY'S arrest), *Brady* violations came to light that led to the vacatur of Ramos' conviction.  The undisclosed *Brady* material consisted of, among other things, denials from the child that abuse occurred before eventually accusing Ramos, that she was considered by her teachers to be "sexually wiser" than her peers, that she watched sexually explicit programs, would expose herself in class, and that she masturbated regularly in school, explaining vaginal irritation (evidence used against Ramos).

141.   Plaintiff Ramos claimed municipal liability based in part on a failure to discipline for *Brady* violations committed by a prosecutor in the BCDAO.  During the discovery process, the court compelled the "Bronx District Attorney's Office to disclose personnel records for prosecutors involved in seventy-two cases in which courts had found improper behavior by prosecutors from 1975 through 1996, and to submit to oral depositions about the Office's 'disciplinary' practices." Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 544 (2011).  Of the seventy-two cases, courts found *Brady* violations in eighteen, and that in fifty-four cases prosecutors presented false, misleading, or inflammatory evidence or delivered improper summation argument. *Id.* at 549.

142.   Discovery in *Ramos* and subsequent civil cases also revealed that the BCDAO, although "employing nearly 400 prosecutors and hundreds of support staff, has no published code or rules of behavior for prosecutors, no schedule of potential sanctions for misbehavior or objective standards governing when such sanctions will be imposed, no written or formal procedure for investigating or disciplining prosecutors, and no procedure for keeping a record of prosecutors

who have been cited for or are known to have engaged in improper behavior. Officials could not identify even one prosecutor since 1975 who, according to the Office's records, has been disciplined in any respect for misbehavior while prosecuting a criminal case. Officials claim that several prosecutors have been verbally chastised, or temporarily denied raises in compensation, but there is no apparent record of it." *Id.*[12]

143.    The offending prosecutor in *Ramos* was deposed on October 7, 1997, less than a year after GARRY'S wrongful conviction. *Id.* 548, fn. 88.  It was revealed that, despite her misconduct and the criticisms levied by the court that vacated the conviction, she faced no sanctions by the BCDAO.[13]  Moreover, the prosecutor stated under oath that "everything [she] did in connection with the Ramos prosecution was consistent with [her] training."  It was her understanding that she was only required to disclose evidence that was "blatantly *Brady"* – that which "tended to exonerate the defendant" or was "crucial" – and that impeachment evidence only had to be turned over if *she* determined that it was "truthful."  *Id.* at 553.

144.    *Ramos* demonstrates that a message was sent to prosecutors in the BCDAO, during times relevant to this case, including to ADA MacDonald who prosecuted GARRY, that *Brady* violations were acceptable and could be committed by prosecutors undeterred and without

---

[12] It was later shown through further discovery that between 1975 and 1996 only one prosecutor was "disciplined" in the BCDAO, and that was for a case that dated back to the 1970s.  That prosecutor was one of fourteen involved in multiple trials where misconduct was found.  And, it is apparent that he was not really disciplined. After the misconduct was noticed in an appeal by the defendant that cited numerous instances of prosecutorial misconduct, he received a 21% raise in salary. And, only after the Appellate Division reversed the conviction, did he receive four weeks of lost pay.  But he then received a bonus shortly thereafter and then a raise, more than making up for the lost wages.  Thereafter, he was cited for misconduct on numerous other occasions by appellate courts. However, he received no sanctions, only pay increases, support by the District Attorney when faced with disciplinary charges, and recommendations for promotion in the Office. *Id.* 550-52.

[13] The decision was rendered on June 1, 1992, approximately three years before GARRY'S arrest.

repercussion. *See also* Articles regarding *Brady* violations and lack of accountability in the BCDAO (Ex. C) (addended hereto and made a part hereof).

145.    In fact, far from discouraging *Brady* violations it was apparent within the BCDAO at times relevant to this action that the Office had the offending prosecutor's back when they committed *Brady* violations, and would do all in its power to protect the offenders. Appealing the decision to vacate in *Ramos*, the BCDAO under DA Johnson challenged the ruling and argued frivolously that the withheld evidence was not *Brady* material. *Id.* at 547.[14]

146.    At a minimum, such a position taken by the Appeals Unit of the BCDAO suggests that the Office did not understand what *Brady* material is, and that a need to educate prosecutors about it was needed, or that the BCDAO had a policy of protecting prosecutors from the consequences of their *Brady* violations.  Moreover, because trial prosecutors look to their Appeals Units for advice and direction on legal questions, and the Unit was wrong, the appeal in *Ramos* in essence advised and directed trial prosecutors to commit *Brady* violations.

147.    In sum, the NYPD and the BCDAO were, at a minimum, deliberately indifferent to an obvious need for greater training and supervision as to *Brady* disclosures, and/or to discipline for *Brady* violations, and this indifference constituted a *de facto* policy against disclosure and was a substantial cause of the violation of GARRY'S federal constitutional rights.

### PLAINTIFF'S INJURIES AND DAMAGES

148.    As a direct and proximate consequence of the aforementioned actions by the Defendants, Plaintiff suffered almost 22 years of imprisonment.

---

[14]  Showing that not much has changed, during the 2014 440 litigation in this case the NYPD attempted to thwart GARRY'S access to documents that ultimately uncovered and substantiated the Martinez confession *Brady* violation; and the BCDAO fought hard against GARRY'S *Brady* claim, and obstructed his ability to prove it by redacting key portions of a police report that corroborated the claim.

149.    Plaintiff also suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit.  He was denied effective treatment for his emotional injuries while incarcerated, and continues to suffer mental anguish to this day.

150.    Plaintiff is afraid to be in crowds and gets nervous using public transportation.

151.    It is very hard and anxiety provoking for him to understand and use technology that passed him by during his incarceration.

152.    Plaintiff was denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family and friends.

153.    Plaintiff is also struggling to gain the trust of family members and to repair broken relationships.

154.    It is now difficult from him to have healthy relationships with women.

155.    Elders in Plaintiff's family died during his incarceration.

156.    It has been extremely difficult for Plaintiff to obtain meaningful employment due to his lengthy incarceration.

157.    Similarly, Plaintiff was denied years of gainful employment and income.  His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

158.    Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated.  Nothing can undo the reputational damage he has sustained.

159.    Plaintiff incurred legal costs.

160.    Plaintiff was denied fundamental constitutional rights and has lost his faith in the American justice system.

## FIRST CAUSE OF ACTION

### Malicious Prosecution under 42 U.S.C. § 1983 and New York State Law
### (Against GEORGE MILIAN and The CITY OF NEW YORK)

161.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

162.    MILIAN caused the initiation and continuance of criminal proceedings against Plaintiff.

163.    There was no probable cause for the criminal proceeding against Plaintiff, and MILIAN knew or should have known as much.

164.    MILIAN acted with actual malice.

165.    The prosecution terminated in GARRY's favor when his conviction was eventually vacated and he was acquitted at the retrial.

166.    Prior to Plaintiff's conviction in 1997, and continuing thereafter, MILIAN covered up, lied to prosecutors about, and withheld knowledge from prosecutors and Plaintiff of, *Brady* material.

167.    Disclosure of this *Brady* material would have revealed to prosecutors that they were without probable cause to pursue the criminal case against Plaintiff.

168.    MILIAN's *Brady* violations are evidence of malice. MILIAN knew that he had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York to: (a) disclose *Brady* material to the BCDAO so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

30

169.    Notwithstanding MILIAN'S awareness of his duties, prior to, during, and following Plaintiff's trial, he intentionally, recklessly, and/or with deliberate indifference to his legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to prosecutors and Plaintiff.

170.    In the context of the remarkably weak cases which rested on dubious eyewitness identifications of Gladys Garcia and Antonio Vargas, Jr., bolstered by the improper multiple viewings of photographs of Plaintiff and the line-ups, evidence that further diminished the quality of either identification, including Vargas' photo picks of suspects other than GARRY, was significant and directly undermined probable cause.

171.    Making matters worse and betraying his malice toward Plaintiff, MILIAN failed to document the photographic picks of other persons by Vargas, he falsely reported the nature and quality of Vargas' and Garcia's identifications to prosecutors and testified falsely at trial.

172.    The acts and conduct of the defendants constitute malicious prosecution in violation of the Fourth Amendment of the United States Constitution, and is a tort under New York State law.

173.    The CITY OF NEW YORK is liable under state law for MILIAN's tortious actions under the doctrine of *respondeat superior.*

### SECOND CAUSE OF ACTION

### Denial of Due Process and Denial of a Fair Trial under 42 U.S.C. § 1983 (Against GEORGE MILIAN)

174.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

175.    MILIAN initiated or caused the initiation of criminal proceedings against Plaintiff.

176.    Prior to Plaintiff's conviction in 1997, and continuing thereafter, MILIAN covered

up, lied to prosecutors about, and withheld knowledge from prosecutors and Plaintiff of, *Brady* material.

177.    MILIAN knew that he had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York to: (a) disclose *Brady* material to the BCDAO so that the it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

178.    Notwithstanding MILIAN'S awareness of his duties, prior to, during, and following Plaintiff's trial, he intentionally, recklessly, and/or with deliberate indifference to his legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to prosecutors and Plaintiff.

179.    MILIAN did so with the knowledge that his conduct would result in the jury being provided a false or misleading picture of the quality of the identification evidence against Plaintiff, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

180.    In the context of this remarkably weak trial case that basically rested on the dubious eyewitness identifications of Gladys Garcia and Antonio Vargas bolstered by the improper multiple viewings of photographs of Plaintiff and the line-ups, any evidence that further diminished the quality of either identification was significant and material to Plaintiff's right due process and a fair trial.

181.     The failure of MILIAN to document and disclose Vargas' reference to others as potential suspects and reveal the true nature of the identification evidence violated the *Brady* rule, which includes evidence that undermines the reliability of an identification, *Smith v. Cain*, 565 U.S. 73, 75-76 (2012), impeachment material, *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Bagley*, 473 U.S. 667 (1985), and information that discredits the caliber of the police investigation. *Kyles v. Whitley*, 514 U.S. 419, 446 (1995).

182.     Moreover, Plaintiff was prejudiced as a result of the *Brady* violation and confidence in the outcome of his trial was undermined.  *Kyles,* 514 U.S. at 434.

183.     MILIAN's actions deprived Plaintiff of due process and a fair trial in violation of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

### THIRD CAUSE OF ACTION

**Denial of Due Process and Denial of Fair Trial based on *Monell* Municipal Liability under 42 U.S.C. § 1983 as to the NYPD and the BCDAO**
**(Against the CITY OF NEW YORK)**

184.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

185.     Prior to Plaintiff's arrest, and during the course of his prosecution, policymaking officials at the NYPD, including but not limited to the New York City Police Commissioner, and policymaking officials at the BCDAO, including but not limited to the District Attorney, acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duties of police and assistant district attorneys to make timely disclosure of *Brady* material and to provide

truthful information about criminal investigations and prosecutions.

186.     Prior to Plaintiff's arrest, and during the course of his prosecution, violations of these constitutional duties were widespread throughout the NYPD and the BCDAO. Through their inaction and failure to address them, policymaking officials at the NYPD and the BCDAO constructively acquiesced in the widespread violations of these constitutional duties by their subordinates.

187.     Individually and collectively, the violations by Det. MILIAN and the NYPD and by ADA MacDonald and/or the BCDAO of Plaintiff's constitutional rights and their prolonging of Plaintiff's injuries were directly, foreseeably, proximately, and/or substantially caused by conduct chargeable to Defendant CITY OF NEW YORK amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to investigation, arrest and prosecution by the NYPD and the BCDAO.

188.     During all times material to this complaint, the CITY OF NEW YORK and the NYPD and the BCDAO, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of criminal suspects or defendants and of other members of the public.

189.     However, the NYPD and the BDCAO and its designees, as policymakers for the CITY OF NEW YORK, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

190.     Policymakers at the NYPD and the BCDAO knew or should have known, to a moral certainty, that police and prosecutors would be in possession of *Brady* material, would interview witnesses, and would elicit their testimony before juries; that such issues presented employees

with difficult choices of the sort that instruction, training, and supervision would make less difficult; that the need for further instruction, training, supervision and discipline was demonstrated by a history of employees mishandling such situations; and that wrong choices by employees concerning these activities would frequently cause violations of the constitutional rights of criminal suspects and the accused and cause them constitutional injury. Yet policymakers at the NYPD and the BCDAO failed to provide adequate training and discipline to avoid such violations.

191.    This acquiescence by policymakers and their failure to train or discipline their subordinates directly, proximately, and substantially caused violations of Plaintiff's due process and fair trial rights.

### *Violations by the NYPD*

192.    Prior to and during Plaintiff's first trial, MILIAN was an agent of the NYPD with a duty to Plaintiff, and was aware that Vargas had picked out people other than Plaintiff as being the light-skinned Hispanic male perpetrator, and that Vargas's line-up identification and Garcia's level certainty in her identification were much weaker than he presented them to be.

193.    MILIAN was also aware that Vargas' photo picks and the true nature of Vargas' and Garcia's identifications was exculpatory and undermined the quality of the police investigation and the identification case against Plaintiff.

194.     However, this exculpatory evidence was never turned over to prosecutors or Plaintiff or his defense counsel for use at trial.

195.    MILIAN'S failure to provide this evidence to the prosecutors was caused by the deliberate indifference of the NYPD to *Brady* violations.

196.    MILIAN and the NYPD had an obligation to disclose this evidence under the right to due process and to a fair trial in the U.S. Constitution, and pursuant to *Brady v. Maryland*, 373

U.S. 83 (1963), and its progeny.

197.    The failure to disclose this exculpatory evidence to Plaintiff prejudiced PLAINTIFF and undermined confidence in the outcome of his trial.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

198.    These failures violated Plaintiff's right to due process of law and to a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

### Violations by the BCDAO

199.    Prior to and during Plaintiff's first trial, ADA MacDonald was an agent of the BCDAO with a duty to Plaintiff and was aware that Stephen Martinez had confessed to the Potter homicide and that Lorel Huffman provided exculpatory and impeachment evidence and was an unreliable informant that needed to be vetted and investigated.

### Stephen Martinez's Confession

200.    ADA MacDonald was also aware that Martinez was an alternate perpetrator for the role Plaintiff was supposed to have played in the crime.

201.    However, this exculpatory evidence was never turned over to Plaintiff or his defense counsel for use at trial.

202.    ADA Macdonald's failure to provide this evidence to the defense was caused by the deliberate indifference of the BCDAO to *Brady* violations.

203.    ADA MacDonald and the BCDAO had an obligation to disclose this evidence under the right to due process and to a fair trial in the U.S. Constitution, and pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

204.    The failure to disclose this exculpatory evidence to Plaintiff prejudiced

PLAINTIFF and undermined confidence in the outcome of his trial.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

205.    These failures violated Plaintiff's right to due process of law and to a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

### *Jailhouse Informant*

206.    In addition to failing to disclose Martinez's confession, ADA MacDonald and the BCDAO committed further *Brady* violations at Plaintiff's first trial in regard to its use of jailhouse informant Lorel Huffman.

207.    To enable the more effective use of Huffman at trial, ADA MacDonald failed to turn over evidence he knew about Huffman's unsavory past that impacted his credibility, including information about providing false information in the other cases for a benefit to himself and about mental health issues that undermined his reliability.

208.    However, this exculpatory and impeachment evidence was never turned over to Plaintiff or his defense counsel for use at trial.

209.    ADA Macdonald's failure to provide this evidence to the defense was caused by the deliberate indifference of the BCDAO to *Brady* violations.

210.    ADA MacDonald and the BCDAO had an obligation to disclose this evidence under the right to due process and to a fair trial in the U.S. Constitution, and pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.

211.    Moreover, despite clear red flags and knowing the need to do a reasonable vetting and investigation into Huffman's past to assess his credibility and provide information to the defense about his past, ADA MacDonald, with a reckless disregard for the truth caused by the

deliberate indifference toward *Brady* violations by the BCDAO, purposely did not vet Huffman or conduct even a basic or rudimentary investigation, including finding documentation available within the BCDAO and/or accessible elsewhere that would have undermined his testimony.

212.    This deliberate lack of vetting and investigation also enabled ADA MacDonald to avoid having to turn over information about Huffman's unreliability that ADA MacDonald knew or should have known existed.

213.    Under the circumstances, ADA MacDonald and the BCDAO had an obligation to vet and investigate Huffman consistent with the right to due process and to a fair trial in the U.S. Constitution, and pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.

214.    The failure to vet and investigate Huffman prejudiced Plaintiff and undermined confidence in the outcome of his trial.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

215.    These failures violated Plaintiff's right to due process of law and to a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

a.   Compensatory damages in an amount to be determined;

b.   Punitive damages in an amount to be determined;

c.   Pre-judgment interest as allowed by law;

d.   An order awarding Plaintiff reasonable attorneys' fees, together with the costs and

disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

e.   Such other further relief as the Court may deem just and proper.

Dated: New York, New York
      July 16, 2019

GLENN A. GARBER, P.C.

By: _____/s/_____
      Glenn A. Garber

The Woolworth Building
233 Broadway, Suite 2370
New York, New York 10279
(212) 965-9370

RICKNER PLLC

By: _____/s/_____
      Rob Rickner

The Woolworth Building
233 Broadway, Suite 2220
New York, New York 10279
(212) 300-6506

*Attorneys for Edward Garry*

**Exhibit A**

*Brady and Related Violations by the NYPD*

1.   *People v. Cortez,* 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police's intentional destruction of tape they were ordered by the court to preserve, and shared responsibility by D.A.'s office in violation caused dismissal of indictment.

2.   *People v. Moss,* 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of evidence about description of the defendant that undermined defense's ability to challenge identification.

3.   *People v. Clausell,* 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose police report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.   *People v. Nikollaj,* 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered where police failed to turn over inconsistent statements of complainant officers. Court also criticized police for conducting improper identification procedures.

5.   *People v. Dunn,* 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

6.   *People v. Johnson,* 81 N.Y.2d 828 (1993): Conviction reversed where police utilized improper identification procedures to implicate defendant.

7.   *People v. White,* 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where police report containing *Brady* and *Rosario* material was not disclosed

8.   *People v. Morrow,* 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

9.   *People v. Rojas,* 213 A.D.2d 56 (1st Dept. 1994): Conviction reversed where identification procedure was tainted by improper and prejudicial conduct.

10.   *People v. Anderson,* 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed officer's notes where lost or destroyed by officer.

11.   *People v. Brogdon,* 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant that may have compromised challenge to identification.

12. *People v. Joseph,* 86 N.Y.2d 565 (1995): Adverse inference instruction required where police deliberately destroyed interview notes.

13. *People v. White,* 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed where loss of police officer's memo book prejudiced defendant's ability to challenge identification.

14. *People v. Pondexter* (contributing factor for wrongful conviction was police pressuring witness to identify defendant)(convicted 1993/exonerated 1997)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4494

15. *People v. Burt* (exoneration delayed because police withheld post-conviction recantation from eyewitness)(convicted 1994/exonerated 2002)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3075

16. *People v. Taylor* (contributing factor for wrongful conviction was the withholding of evidence by police and prosecutors that defendant did not meet the description of the perpetrator)(convicted 1989/exonerated 2004)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3935

17. *People v. Greene* (contributing factor for wrongful conviction was improper identification procedures, manipulating witness to falsely identify defendant, and withholding of exculpatory evidence)(convicted 1985/exonerated 2006)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3951

18. *Garcia v. Portunado,* 2007 WL 542224 (SDNY 2007)(contributing factor of wrongful conviction was police pressuring witness to falsely implicate defendant)(convicted 1993/exonerated 2007)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3835

19. *People v. Collins* (contributing factors for wrongful conviction was systemic pattern of police and prosecutorial misconduct, including witness intimidation)(convicted 1995/exonerated 2010)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3115

20. *People v. Devon Ayers* (in two unrelated homicide convictions against defendant contributing causes of wrongful convictions were police manipulation of unreliable witnesses and lying to prosecutors about manufactured evidence)(convicted 1997/exonerated 2012)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4075
     *(related cases, People v. Vasquez, People v. Cosme, People v. Perez, People v. Glisson and People v. Watkins)*

21. *People v. O'Neal* (contributing factor for wrongful conviction was police withholding evidence that victim said defendant was not her attacker)(convicted 1985/exonerated 2013)https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4246

22. *People v. Ranta* (contributing factor for wrongful conviction was police influencing witness to make an identification)(convicted 1991/exonerated 2013)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4127

23. *People v. Deacon* (contributing factor for wrongful conviction was police pressuring witness to implicate defendant)(convicted 1989/exonerated 2013)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4307

24. *People v. Fleming* (contributing factor for wrongful conviction was police pressuring witness to implicate defendant)(convicted 1990/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4412

25. *People v. Austin* (contributing factors for wrongful conviction were police influencing witness to make an identification and the use of an unreliable informant)(convicted 1988/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4427
(related cases *People v. Hill* and *People v. Jennette*)

26. *People v. McCallum* (contributing factor for wrongful conviction was police coercing confession from defendant and co-defendant)(convicted 1986/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4524
(related case *People v. Stuckey*)

27. *People v. Wilson* (contributing factor for wrongful conviction was police coercing confession from defendant and co-defendant)(convicted 1994/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4372
(related case *People v. Yarbough*)

28. *People v. Connor* (contributing factor for wrongful conviction were police pressuring witness to falsely implicate defendant and co-defendant)(convicted 1993/exonerated 2015)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4724
(related case *People v. Wagstaffe*)

29. *People v. Hamilton* (contributing factor for wrongful conviction was police influencing witness to not support defendant's alibi)(convicted 1992/exonerated 2015)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4601

30. *People v. Shakur* (contributing factor for wrongful conviction was police fabrication of confession)(convicted 1989/exonerated 2015)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4701

31. *People v. Gathers* (contributing factor for wrongful conviction was police using false evidence ploy to manipulate defendant to falsely confess)(convicted 1998/exonerated 2016)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4839

32.   *People v. Hincapie,* (contributing factor for wrongful conviction was improper police investigation techniques that involved coerced confession)(convicted 1991/exonerated 2017)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5094

33.   *People v. Washington* (contributing factor for wrongful conviction was police falsification about the quality of the identifications)(convicted 1997/exonerated 2017)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5170

34.   *People v. Bunn* (contributing factor for wrongful conviction was arresting placing him in line-up despite lack of any evidence connecting him to crime and although his description varied widely from the perpetrator, among other things)(convicted 1992/exonerated 2018)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5327
(related case *People v. Hargrave*)

35.   *People v. Moses* (contributing factor for wrongful conviction was confession coerced by police)(convicted 1997/exonerated 2018)

36.   *People v. Williams* (contributing factor for wrongful conviction was police coercing witness to falsely identify defendant)(convicted 1994/exonerated 2018)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5358

37.   *People v. Buari* (contributing factors for wrongful conviction was improper police investigation techniques)(convicted 1995/exonerated 2018)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5297

38.   *People v. Burton* (contributing factors for wrongful conviction was improper police investigation techniques and failure to investigate viable alternate suspect)(convicted 1991/exonerated 2019)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5485

**Exhibit B**

*Brady Violation and Related Misconduct by Bronx District Attorney's Office*

1.      *People v. Velez*, 118 A.D.2d 116 (1986): Prosecutor committed *Brady* violation by failing to disclose that the prosecution's key witness was biased against defendant.

*2.      People v. Okafor,* N.Y.L.J. 9/8/1989 at p. 21: *Brady* violation found where prosecutor withheld exculpatory witness statements.

3.      *People v. Olmo,* 153 A.D.2d 544 (1ˢᵗ Dept. 1989): Remand for new *Wade* hearing because police (and likely prosecutor) withheld exculpatory evidence that undermined quality of identification procedures.

4.      *People v. Negron,* 161 A.D.2d 537 (1ˢᵗ Dept. 1990): Conviction reversed where, among other things, prosecutor delivered a misleading summation.

5.      *People v. Algarin* (contributing factors for wrongful conviction were improper investigation techniques, including improper witness preparation, and perjury)(convicted 1985/exonerated 1990) http://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3876 (related cases, *People v. Beauchamp* and *People v. Jesus Torres*).

6.      *People v. Lewis,* 174 A.D.2d 294 (1ˢᵗ Dept. 1992): Conviction reversed where prosecutor failed to disclose benefits offered to prosecution witness.

7.      *People v. Butler,* 185 A.D.2d 141 (1ˢᵗ Dept. 1992): Conviction reversed for misleading summation.

8.      *People* v. *Banfield,* 194 A.D.2d 330 (1ˢᵗ Dept. 1993): Conviction reversed where prosecutor failed to disclose benefits offered to prosecution witness.

9.      *People v. Pejcinovic* (contributing factors were failure of police and prosecutors to investigate other perpetrator in one witness identification case)(convicted 1988/exonerated 1993) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4451

10.     *People* v. *White,* 200 A.D.2d 351 (1ˢᵗ Dept. 1994): Conviction reversed where prosecutor withheld exculpatory evidence that eyewitness made prior statements that contradicted trial testimony.

11.     *People v. Rutter,* 202 A.D.2d 123 (1ˢᵗ Dept. 1994), and *People v. Bowen,* 234 A.D.2d 161 (1ˢᵗ Dept. 1996): Convictions reversed because, among other things, the prosecutor failed to disclose exculpatory and impeachment evidence that undermined credibility of a prosecution's main witness.

12.     *People v. Jackson*, 168 Misc. 2d 182 (Sup. Ct. 1995): *Brady* violation found

where prosecutor failed to disclose statements from prosecution witness showing an inability to recall substantive details of events at issue.

13.     *People v. bin Wahad* (contributing factor for wrongful conviction was the withholding of *Brady* and impeachment evidence that undermined prosecution witness and theory of case)(convicted 1973/exonerated 1995) (https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3028

14.     *People* v. *Lantigua,* 228 A.D.2d 213 (1st Dept. 1996): Conviction reversed where prosecutor failed to disclose evidence that could have been investigated to undermine eyewitness account, and for misleading summation.

15.     *People v. Collins,* 173 Misc.2d 350 (Sup. Ct. Bronx Co. 1997): Conviction set aside for prosecutor's failure to disclose complainant's history of mental illness and substance abuse.

16.     *People* v. *King,* 241 A.D.2d 329 (1st Dept. 1997): Conviction reversed where prosecutor delayed turning over impeachment material for prosecution witness.

17.     *People v. Ortega,* 241 A.D.2d 369 (1st Dept. 1997): Conviction reversed where, among other things, prosecutor failed to disclose prior testimony of eyewitness that may have be used for impeachment.

18.     *People v. Mikel,* 274 A.D.2d 325 (1st Dept. 1997): Conviction reversed where prosecutor failed to disclose witness' violation of cooperation agreement and existence of new cooperation agreement.

19.     *Morales and Montalvo v. Portunado,* 154 F.Supp.2d 706 (S.D.N.Y. 2001), 165 F.Supp.2d 601 (S.D.N.Y. 2001): Convictions of two defendants set aside based on prosecutor's failure to disclose impeachment evidence for a prosecution witness.

20.     *People v. Grady* (contributing factors for wrongful conviction were improper investigation techniques, improper witness preparation, and perjury)(convicted 1986/exonerated 1997) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3877

21.     *Mendez v. Artuz,* 303 F.3d 411 (2d Cir. 2002): Conviction set aside where prosecutor failed to disclose evidence that a third-party ordered a hit on the victim, which undermined the motive theory against the defendant.

22.     *Flores v. Demskie,* 215 F.3d 293 (2d Cir. 2002): Conviction set aside due to late disclosure of prior statements that could have been used to impeach witness.

23.     *People v. Bambury* (contributing factors for wrongful conviction were misleading statements by prosecutor about credibility of prosecution witness)(convicted 1999/exonerated 2002)

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4317

24.     *People v. Johnson,* 191 Misc.2d 105 (Sup. Ct. Bronx Co. 2002): Conviction vacated for *Brady* and *Rosario* violations.

25.     *People v. Bruno,* Ind. No. 0027/97, N.Y.L.J., 4/23/03 at p. 19: Conviction reversed where prosecutor withheld information casting doubt on the voluntariness of a confession.

26.     *People v. Maldonado* (contributing factor of wrongful conviction was prosecution withholding evidence that crime was committed by another person)(convicted 1998/exonerated 2004)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4319
(related case *People v. Poventud*).

27.     *People v. Taylor* (contributing factor for wrongful conviction was the withholding of evidence by police and prosecutors that defendant did not meet the description of the perpetrator)(convicted 1989/exonerated 2004)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3935

28.     *People v. Garcia*, 46 A.D.3d 461 (2007): Conviction reversed for failure of prosecution to disclose exculpatory statements that contradicted complainant's account of the crime.

29.     *Garcia v. Portunado,* 2007 WL 542224 (SDNY 2007)(contributing factors of wrongful conviction were prosecutions failure to investigate alibi and misleading argument to jury)(convicted 1993/exonerated 2007)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3835
(related case *Morillo v. Portunado*).

30.     *People v. Waters*, 35 Misc. 3d 855 (Sup. Ct. 2012): New trial ordered for prosecution's suppression of *Brady* material – chief prosecution witness changed his account of how the crime occurred.

31.     *People v. Blyden* (contributing factor of wrongful conviction was delayed disclosure of evidence that led to witnesses that exculpated defendants)(convicted 2007/exonerated 2014)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4397
(related case *People v. Johnson*).

32.     *People v. Jimenez*, 142 A.D.3d 149 (N.Y. App. Div. 2016): Remand for hearing to determine whether prosecution violated *Brady* by failing to disclose terms of a cooperation agreement.

33.     *People v. Rosario* (contributing factor for wrongful conviction was withholding by  prosecutor of evidence that undermined eyewitness' ability to make an

identification)(convicted 1998/exonerated 2016)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5031

34.     *People v. McKee* (contributing factor for wrongful conviction was prosecution's failure to turn over prior statements of prosecution witness)(convicted 1997/exonerated 2018)
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5271

**Exhibit C**

*Articles Regarding Brady Violations and Lack of Accountability*
*in the Bronx District Attorney's Office*

1. Radley Balko, *Misbehaving Bronx Prosecutors rarely sanctioned*, Washington Post, June 6, 2014 (available at https://www.washingtonpost.com/news/the-watch/wp/2014/06/16/add-it-to-the-pile-misbehaving-bronx-prosecutors-rarely-sanctioned/?noredirect=on&utm_term=.a44708193ccc).

2. Beth Schwartzapfel, *New York Courts Say: Hand It Over*, The Marshall Project, Nov. 8, 2017 (available at https://www.themarshallproject.org/2017/11/08/new-york-courts-say-hand-it-over) (wrongful conviction of Steven Odiase involved prosecutors withheld key witness statements that could have helped prove innocence).

3. Task Force on Criminal Discovery, New York State Bar Association, January 30, 2015 (available at http://www.nysba.org/workarea/DownloadAsset.aspx?id=54572) ("As far back as 1990, a Bronx study by the Victim Service Agency, based on complaint room interviews with 226 victims of a broad range of crimes, found that between 36% and 41% had been threatened and that those victims were three times more likely to decide to drop charges. Robert Davis, Barbara Smith and Madeline Henley, *Victim Witness Intimidation in Bronx Courts*, Victims Service Agency (New York, June 1990).

4. Ellen Yaroshefsky, Wrongful Convictions: It Is Time to Take Prosecution Discipline Seriously, 8 U. D.C. L. Rev. 275, 281–82 (2004) (addressing lack of accountability in the Bronx District Attorney's Office for *Brady* violations from 1975 to 1996).

5. Andrea Elliott, *Prosecutors Not Penalized, Lawyer Says*, N.Y. Times, Dec. 17, 2003 (available at https://www.nytimes.com/2003/12/17/nyregion/prosecutors-not-penalized-lawyer-says.html (discussing lack of sanctions for Bronx who committed prosecutorial misconduct and was criticized in appellate decisions of five criminal cases).

6. Andrea Elliott, *When Prosecutors Err, Others Pay the Price; Disciplinary Action is Rare After Misconduct or Mistakes*, N.Y. Times, March 21, 2004 (available at https://www.nytimes.com/2004/03/21/nyregion/when-prosecutors-err-others-pay-price-disciplinary-action-rare-after-misconduct.html) (addressing serious misconduct of prosecutors in the Bronx cases in the last 15 years, a failure to discipline, and even rewards).

7. Voices of New York, Bronx Bureau, *No Penalties for Prosecutors Errors in the Bronx,* June 12, 2014